IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MARTY STOUFFER and
MARTY STOUFFER PRODUCTIONS, LTD;

       Plaintiffs,

v.

NATIONAL GEOGRAPHIC PARTNERS, LLC;
NGSP, INC.;
NGHT, LLC, d/b/a NATIONAL GEOGRAPHIC DIGITAL MEDIA;
NGHT DIGITAL, LLC;
NGC NETWORK US, LLC; and
NGC NETWORK INTERNATIONAL, LLC

       Defendants.

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

---

COMES NOW Plaintiffs Marty Stouffer Productions, Ltd. and Marty Stouffer (collectively, "MSP"), by and through undersigned counsel, and for their Complaint against Defendants National Geographic Partners, LLC, NGSP, Inc., NGHT, LLC d/b/a National Geographic Digital Media, NGHT Digital, LLC, NGC Network US, LLC, and NGC Network International, LLC, hereby state and allege as follows:

#### PARTIES

1.    Plaintiff Marty Stouffer Productions, Ltd. ("MS Productions") is a private limited company organized and existing under the laws of the State of Colorado with a principal place of business in the State of Colorado.

2.    Plaintiff Marty Stouffer ("Stouffer") is a resident of the State of Colorado.

3.     Defendant National Geographic Partners, LLC ("NGP") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

4.     Defendant NGSP, Inc. ("NGSP") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

5.     Defendant NGHT, LLC d/b/a National Geographic Digital Media ("NGHT") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

6.     Defendant NGHT Digital, LLC ("NGHT Digital") is a limited liability company organized and existing under the laws of the State of Delaware. Upon information and belief, NGHT Digital has a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

7.     Defendant NGC Network US, LLC ("NGC Network US") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

8.     Defendant NGC Network International, LLC ("NGC International") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 1145 17th Street, NW, Washington, DC 20036.

9.     Defendants NGP, NGSP, NGHT, NGHT Digital, NGC Network US, and NGC International collectively create, manage, distribute, license, and offer for sale content, products, and goods under the National Geographic brand, including the infringing content and works complained of herein. Defendants are collectively referred to as the National Geographic Defendants.

## JURISDICTION AND VENUE

10.     This is an action for trademark infringement, trademark dilution, unfair competition, and copyright infringement in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and the common law of the State of Colorado. This Court has original subject matter jurisdiction over Federal Lanham Act Claims and Federal Copyright Act Claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332, and 1338; and supplemental jurisdiction over MSP's state law claims pursuant to 28 U.S.C. §§ 1338 and 1367.

11.     This Court has personal jurisdiction over the National Geographic Defendants because this action stems from the National Geographic Defendants' business activities within the State of Colorado and tortious acts causing injury within the State of Colorado.

12.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the State of Colorado.

## FACTUAL BACKGROUND

13.     MS Productions is the creator of Wild America, the most broadcast TV show in Public Broadcasting Service ("PBS") history and one of the most successful nature and wildlife documentary television series ever produced.

14.     MS Productions has produced award-winning wildlife and nature documentary television programming since 1974, when it was incorporated. Prior to 1974, its principal, Marty Stouffer, produced wildlife and nature documentary television programming and films individually since 1964.

15.     MSP has a federal trademark registration (U.S. Reg. No. 2,194,557) for WILD AMERICA, in standard character form, for entertainment services in the nature of a continuing

television series depicting animals and their habitat in International Class 41 (hereinafter, the "Wild America Mark").

16.     On or about October 6, 2004, MSP filed a Combined Declaration of Use and Incontestability Under Section 8 & 15 which was accepted and acknowledged by the USPTO on or about January 18, 2005.

## History of Marty and Mark Stouffer and Creation of MSP

17.     Brothers Mark Stouffer and Marty Stouffer (the "Stouffer Brothers") grew up in Fort Smith, Arkansas, where they discovered a love for both filmmaking and wildlife at a young age. As teenagers, the Stouffer Brothers recorded their first wildlife films on their family's 8mm motion picture camera, travelling as far away as Alaska to record footage.

18.     In 1970, the Stouffer Brothers left Fort Smith, Arkansas with the goal of travelling around the United States to record every animal on the U.S. Department of Interior's Endangered Species list. As they begin building this film library, the Stouffer Brothers began to achieve some fame, attracting the attention of viewers and even celebrities such as Robert Redford.

19.     In 1974, the Stouffer Brothers founded MS Productions to produce nature and wildlife documentaries.

20.     By 1980, MS Productions had produced numerous nature documentaries for primetime network television and for educational distribution to schools and libraries including the 1972 documentary "Bighorn!", the 1974 documentary "At the Crossroads," and the 1977 NBC Prime Time network special "The Predators" which was narrated by Robert Redford.

21.     "The Predators" had a primetime viewing audience of 26 million viewers at its airing.

4

22.     MS Productions also produced the 1978 ABC Prime Time documentary entitled "The Man Who Loved Bears" which was narrated by Will Geer and Henry Fonda.

23.     MS Productions also co-produced several ABC specials from 1975-1983 involving John Denver entitled "John Denver's Rocky Mountain Christmas," "John Denver's Rocky Mountain Reunion," "John Denver: Music and the Mountains," and "John Denver: The Higher We Fly."

24.     Through the production of such documentaries, the Stouffer Brothers began developing their unique style of filmmaking which utilized specialized and proprietary film equipment and techniques including time lapse and extreme slow motion.

## Creation and Success of Wild America

25.     In 1980, Stouffer developed an idea for a half-hour documentary television series called "Wild America." Wild America would be devoted exclusively to exploring the nature and wildlife of North America.

26.     Each episode of Wild America was created and produced by the Stouffer Brothers, and is hosted by Stouffer.

27.     In 1981, MSP entered into a broadcasting agreement with the Public Broadcasting Service ("PBS") to air Wild America across the entire PBS System of 265 channels.

28.     Wild America debuted on PBS in 1982, becoming an immediate success.

29.     In 1982, MSP registered the Wild America Mark with the U.S. Patent and Trademark Office, and has been the exclusive owner of the Wild America Mark ever since.

30.     During its fourteen years on PBS, Wild America never fell out of the top ten most viewed television shows on PBS.

31.     In many years, Wild America was PBS's most watched show; at times being viewed by more than 450 million viewers in a single week.

32.     To date, Wild America is the most broadcast series to ever air on PBS, with billions of viewers having watched episodes of Wild America.

33.     Even after the Wild America series ended, MSP continued to produce another ten (10) half-hour episodes and to produce and distribute twelve (12) one-hour Wild America Specials which were successfully advertised, marketed, and sold as VHS and DVD Home Videos in the 1990s and 2000s.

34.     In total, MSP produced over 120 half-hour episodes and 12 one-hour Specials under the Wild America Mark.

35.     Each episode and each Special of Wild America was individually copyrighted by MSP in a timely manner, immediately upon their completion.

36.     The footage produced by MSP for the production of Wild America remains the single largest collection of North American nature and wildlife film in the world.

37.     Throughout Wild America's fourteen year run, the Stouffer Brothers developed a unique filming style for the show, which utilized slow motion, close-ups, and time lapses to give viewers a more immersive experience than other nature and wildlife documentary programming.

**The Wild America Mark is a Famous Mark that is Recognized by its Many Loyal Viewers**

38.     The Wild America Mark is unquestionably a famous mark, as the series has been viewed billions of times and has made a lasting impression on the cultural consciousness.

39.     The Wild America series has aired continually on television in the United States for an unprecedented thirty-eight (38) years and was recently licensed for an additional five (5) years in syndication.

40.     MSP has sold over $60 million worth of VHS and DVD copies of Wild America.

41.     Even today, Wild America is still in syndication on over 140 major network channels across the United States and its outlying territories.

42.     The Wild America brand has grown beyond just the documentary series and includes a feature film, videos, books and other affiliated products.

43.     Wild America has come to occupy a place of fame in contemporary culture, having been featured in commercials for products such as Pepsi Co.'s Mountain Dew and even being the topic of a major motion picture.

44.     In 1997, Mark and Marty Stouffer succeeded in producing a $20 million, major motion picture entitled Wild America ("the Wild America movie") in conjunction with Morgan Creek Productions, which was distributed by Warner Bros. Entertainment, Inc.

45.     The Wild America movie chronicled the childhood of Mark and Marty Stouffer, along with their younger brother, Marshall Stouffer, and the origins of their passion for nature and filmmaking.

46.     Currently, in addition to being available for purchase on DVD, episodes of the Wild America documentary television series and the Wild America Specials are available to stream or purchase on various online platforms, including Amazon Video Direct, Google Play, and Apple iTunes.

**National Geographic Defendants and MSP Have a Longstanding Relationship**

47.     Due to MSP's success in the documentary filmmaking field, Mark Stouffer, Marty Stouffer, and the Wild America television series were well known by many executives and employees that worked for the National Geographic Defendants.

48.     The Stouffer Brothers produced highly-rated and critically praised documentaries for the National Geographic Defendants, including at least one film which won an Emmy.

49.     Aware of the success of the Wild America series, the National Geographic Defendants hired Mark Stouffer in 1995 to produce a half-dozen of their network specials. He worked for the National Geographic Defendants until 2002.

50.     In advertising documentary films made by the Stouffer Brothers, the National Geographic Defendants would reference their famous work on the Wild America series.

51.     Upon information and belief, the National Geographic Defendants encouraged their documentary filmmakers to mimic the film style developed by MSP.

52.     The National Geographic Defendants launched the National Geographic Channel ("Nat Geo TV") in the United States in 2001.

53.     Nat Geo TV primarily features nonfiction programming that typically involves nature, science, culture and history.

54.     In 2010, the National Geographic Defendants launched Nat Geo WILD, a sister channel to Nat Geo TV.

55.     Nat Geo WILD features primarily wildlife and natural history programming.

56.     Upon information and belief, the National Geographic Defendants struggled upon the launch of Nat Geo TV and Nat Geo WILD to make both channels profitable.

57.     In 2015, under a reorganization of Defendant NGP, 21st Century Fox Inc. became the majority shareholder of NGP with an acquisition of 73% of the substantial media assets of NGP.

**The National Geographic Defendants Begin Their Infringing Activities**

58.     Upon information and belief, the National Geographic Defendants saw a template for commercial success in Wild America and the work of MSP.

59.     Throughout 2010 and 2011, MSP and the National Geographic Defendants engaged in numerous discussions regarding the National Geographic Defendants potentially licensing or purchasing the Wild America Film Library from MSP.

60.     At various times in 2010 and 2011, the National Geographic Defendants declined to purchase the Wild America Film Library, but asked MSP to keep the National Geographic Defendants apprised of any updates regarding the sale of the film library.

61.     On or around November 1, 2010, National Geographic Channel Executive Vice President Steve Burns emailed MSP, explaining that Nat Geo TV was planning to release a natural history miniseries in 2012.

62.     Steve Burns sought permission to title the miniseries "Wild Americas," or in the alternative "Wildest Americas."

63.     On or around November 1, 2010, MSP explained in an email to Steve Burns that Wild America was trademarked and that both of titles proposed for the National Geographic Defendants' series would be too close to the Wild America Mark for approval by MSP.

64.     In seeking permission to use a variation of the Wild America Mark, the National Geographic Defendants indicated an awareness of the Wild America brand and trademark.

65.     Upon information and belief, the National Geographic Defendants aired the documentary series in 2012 under the title "Untamed Americas" within the United States.

66.     The Untamed Americas documentary series is currently marketed and sold outside of the United States under the title "Wild America."

67.     The "Untamed Americas (Wild America)" series is available for purchase on DVD and Blu-Ray. As demonstrated below, the packaging for the series is nearly indistinguishable from MSP's Wild America:







68.     The 2012 Untamed Americas (Wild America) series can be purchased under the title Wild America and shipped into the United States.

69.     Unaware that the National Geographic Defendants were improperly using the Wild America Mark in conjunction with the Untamed America miniseries, MSP continued to negotiate and discuss licensing or selling the Wild America film library to the National Geographic Defendants.

70.     As part of those 2012 discussions, the National Geographic Defendants and MSP discussed using Wild America footage to create content for a new, then-unnamed Nat Geo TV series starring television personality Casey Anderson.

71.     Throughout the 2012 discussions, no arrangement was reached for the National Geographic Defendants to purchase or license the Wild America Mark.

72.     In 2013, the National Geographic Defendants released the new television series under the title "America the Wild."

73.     America the Wild bears a striking resemblance to Wild America, replicating the most minute details of Wild America in its production.

74.     In addition to the name America the Wild being virtually indistinguishable from the name Wild America, each episode of America the Wild closely tracks the subject matter and wildlife species of specific episodes of Wild America.

75.     By way of example, in several episodes of Wild America, host Marty Stouffer, on the left in the images below, interacts with a grizzly bear he raised from a cub, while in several episodes of America the Wild, host Casey Anderson, on the right in the images below, does the same:

 

76.     In addition to a virtually identical title, the National Geographic Defendants market and offer for sale America the Wild using a similar mark and style for DVD packaging:

 

77.     The similarities between Wild America and America the Wild include storylines, visual appearances, and filming styles, as the following examples illustrate. Images from Wild America are on the left and images from America the Wild are on the right:

 

Fig. 1 – Marty Stouffer, on the left, interacts with a ram, while Casey Anderson, on the right, headbutts a stuffed ram, evoking the imagery from Wild America's introductory scene, in which two rams butt heads dramatically.

 

Fig. 2 – Marty Stouffer, on the left, films footage for an episode of Wild America, while Casey Anderson, on the right, poses for a photo shoot during an episode of America the Wild.

 

Fig. 3 – Marty Stouffer, on the left, interacts with a grizzly bear, while Casey Anderson, on the right, does the same.

78.     The similarities between America the Wild and Wild America are wide-ranging, including an uncanny similarity between each show's host.

79.     America the Wild stars Casey Anderson, a Nat Geo TV personality whose appearance and persona closely resemble the distinctive look and style of Marty Stouffer. In the following example, Marty Stouffer is on the left and Casey Anderson is on the right:




80.     Additionally, the National Geographic Defendants specifically copy many iconic images from Wild America, including, among others, the image of two big horn sheep head-butting one another.

81.     The National Geographic Defendants copied the structure of Wild America in many of its Untamed Americas and America the Wild episodes, specifically by introducing an animal, following said animal, recording footage of the animal in conflict, and providing information about the animal.

82.     The National Geographic Defendants have appropriated elements of copyrighted Wild America episodes, including, but not limited to, animal point of view camera shots, slow-motion action shots, anthropomorphized story-telling and presentation; transition scenes between segments; and close-up shots of animals in their native habitats.

83.     By improperly copying Wild America down to its most fundamental elements and infringing the Wild America Mark, America the Wild was a success for the National Geographic Defendants built upon the goodwill of the Wild America Mark and brand.

84.     Upon information and belief, based on the success of America the Wild, the National Geographic Defendants re-released previously aired nature and wildlife documentary programming starring Casey Anderson under the new America the Wild brand.

85.     In 2014, the National Geographic Defendants released another documentary movie series titled "Surviving Wild America."

86.     Surviving Wild America featured two Australian hosts exploring the Okefenokee Swamp, located in the Southeastern region of the United States.

87.     Upon information and belief, the National Geographic Defendants launched a new documentary series titled "America's Wild Frontier" on or about March 2, 2018 which is still premiering new episodes[1].

88.     Together, "Untamed Americas (Wild America)," "America the Wild," "Surviving Wild America," and "America's Wild Frontier" (collectively "the Infringing Series"), brought, and continue to bring, success to the National Geographic Defendants by building on the goodwill and brand recognition of MSP's Wild America.

89.     The National Geographic Defendants directly benefitted from the more than $24.5 million dollars spent by MSP to advertise, promote and market the Wild America Mark, brand and home video releases.

---

[1] "America's Wild Frontier" was launched by the National Geographic Defendants following notice to Defendants of this dispute by MSP over concerns related to the Wild America Mark.

90.     The National Geographic Defendants have built the Infringing Series into a larger brand, at the expense of the goodwill built up by MSP through the many years of producing and releasing film and video products, and other elements, under the Wild America Mark.

91.     Upon information and belief, the National Geographic Defendants have licensed the Infringing Series to third parties.

92.     Prior to the release of America the Wild, the National Geographic Defendants licensed the America the Wild brand to Relentless Software and SkyBox Labs to develop videogame software to be used on Microsoft Corp.'s Xbox 360 video game console.

93.     The software, released as "Kinect Nat Geo TV" was published by Microsoft Corp.

94.     Kinect Nat Geo TV lets players interact with episodes of America the Wild through various motion-sensor controlled mini-games.

95.     Upon information and belief, the National Geographic Defendants have made the Infringing Series available to purchase or to stream through various third-parties, including on Amazon Video Direct, Google Play and Apple's iTunes as well as on websites controlled by the National Geographic Defendants.

96.     The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

97.     Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

98.     Notwithstanding the National Geographic Defendants' actual and constructive notice of MSP's Wild America Mark, the National Geographic Defendants have infringed and continue to infringe the protected mark in connection with the Infringing Series.

99.     The National Geographic Defendants' use of a mark that is so similar to MSP's Wild America Mark creates significant confusion among consumers. The National Geographic Defendants' use of the words Wild America in the titles of the Infringing Series creates significant confusion among consumers.

100.     The National Geographic Defendants' infringement of the Wild America Mark in connection with the syndication, broadcasting, sale, and distribution of the Infringing Series will continue to cause confusion, including by misleading consumers to believe that the Infringing Series produced by the National Geographic Defendants are approved, provided, endorsed, affiliated with, and/or sponsored by MSP.

101.     Upon information and belief, the National Geographic Defendants have knowingly infringed the Wild America Mark to market the Infringing Series to attract consumers, knowing that consumers will wrongly believe that such use is approved, sponsored, associated, or affiliated with MSP.

### FIRST CAUSE OF ACTION
### Federal Trademark Infringement
### (15 U.S.C. § 1114)

102.     MSP hereby realleges and reincorporates the entirety of the preceding paragraphs as if fully restated herein.

103.     MSP owns the exclusive rights to use the Wild America Mark. The use of the Wild America Mark indicates that MSP is the source of Wild America content.

104.     Defendants are directly infringing MSP's Wild America Mark.

105.     MSP has never consented to the National Geographic Defendants' use of the Wild America Mark or of any confusingly similar trademarks to the Wild America Mark.

106. MSP's Wild America Mark is very strong and is associated by consumers in the United States and abroad with MSP's unique nature and wildlife documentary programming.

107. The National Geographic Defendants use MSP's Wild America Mark to market, sell, distribute, advertise, and title its Infringing Series.

108. Both the National Geographic Defendants and MSP advertise, market, produce, and distribute nature and wildlife documentary programming.

109. The National Geographic Defendants' infringement of MSP's Wild America Mark is intended to and is likely to create consumer confusion about the source of their programming and to trade upon MSP's established reputation and goodwill with consumers, in violation of 15 U.S.C. § 1114.

110. Consumers interested in viewing high-quality nature and wildlife documentary programming rely heavily on trademarks and branding to guide their consuming decisions and often do not otherwise regularly investigate the source and origin of the programming in which they are interested.

111. As a proximate result of the unfair advantage accruing to the National Geographic Defendants from using a confusingly similar trademark and deceptively trading on MSP's goodwill, the National Geographic Defendants have made substantial sales and profits in amounts to be established at trial.

112. The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

113. Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

114.    By reason of the National Geographic Defendants' acts as alleged above, MSP has suffered and will continue to suffer damage and injury to its business, reputation, and goodwill.

115.    MSP has been deprived of substantial sales and profits and the value of its trademark as a commercial asset, in amounts to be established at trial.

116.    Defendant's actions were committed with actual notice of MSP's exclusive rights and constitute knowing, deliberate, and willful infringement of MSP's Wild America Mark. Thus, this is an exceptional case under 15 U.S.C. § 1117.

117.    Pursuant to 15 U.S.C. § 1117, MSP is entitled to recover compensatory damages not to exceed three times its actual damages and the National Geographic Defendants' profits, to be established at trial, and reasonable attorney's fees and costs.

118.    As a result of the National Geographic Defendants' conduct, the National Geographic Defendants have caused and, unless restrained and enjoined by this Court under 15 U.S.C. § 1116, will continue to cause irreparable harm, damage, and injury to MSP.

119.    MSP has no adequate remedy at law to prevent the continued infringement of its Wild America Mark.

### SECOND CAUSE OF ACTION
### Federal Trademark Dilution
### (15 U.S.C. § 1125(c))

120.    MSP hereby realleges and reincorporates the entirety of the proceeding paragraphs as if fully restated herein.

121.    MSP's Wild America Mark has been in use and registered since 1982.

122.    MSP's Wild America has been sold across the country and abroad, reaching sales in excess of $60 million.

123.    The Wild America series has been viewed by more than billions of consumers over the course of its initial broadcast and in subsequent syndication.

124.    Wild America has been a success in large part due to MSP's advertising of the Wild America series and the Wild America Mark. MSP has spent more than $24.5 million advertising Wild America for over thirty years throughout the United States and abroad.

125.    The Wild America Mark is famous within the meaning of 15 U.S.C. § 1125(c).

126.    The National Geographic Defendants began infringing the Wild America Mark after the Wild America Mark became distinctive and famous.

127.    The similarity between the Wild America Mark and the Infringing Series gives rise to an association between MSP's Wild America and the National Geographic Defendants' Infringing Series. This similarity has resulted in likely confusion, and in fact has resulted in actual confusion, among consumers as to the source, sponsorship, or affiliation of the Infringing Series.

128.    The association created by the National Geographic Defendant's infringement of the Wild America Mark has and likely will continue to injure MSP's business reputation and dilute the value of the Wild America Mark. The continuing infringement of the Wild America Mark by the National Geographic Defendants will further adversely affect and deprive MSP of the distinctiveness of the Wild America Mark and is likely to tarnish MSP's Wild America Mark by undermining the goodwill associated with the Wild America Mark.

129.    The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

130.    Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

131.    The National Geographic Defendants' acts pleaded herein violate 15 U.S.C. § 1125(c) and are willful and intentional acts conducted by the National Geographic Defendants with full knowledge of the fame of MSP's Wild America Mark and of MSP's rights in the Wild America Mark.

132.    Pursuant to 15 U.S.C. § 1117, MSP is entitled to recover compensatory damages not to exceed three times its actual damages and the National Geographic Defendants' profits, to be established at trial, and reasonable attorney's fees and costs.

133.    As a result of the National Geographic Defendants' conduct, the National Geographic Defendants have caused and, unless restrained and enjoined by this Court under 15 U.S.C. § 1116, will continue to cause irreparable harm, damage, and injury to MSP.

134.    MSP has no adequate remedy at law to prevent the continued dilution of its Wild America Mark.

**THIRD CAUSE OF ACTION**
**Federal Unfair Competition**
**(15 U.S.C. § 1125(a))**

135.    MSP hereby realleges and reincorporates the entirety of the preceding paragraphs as if fully restated herein.

136.    MSP's Wild America Mark has been used since 1982 to designate the Wild America documentary series as originating from MSP. MSP has, at all times, been the source of Wild America documentary programming.

137.     Some of Wild America's most iconic imagery and branding, including but not limited to, the image of two big-horn rams butting head and host Marty Stouffer's on-screen persona constitute protectable trade dress which has developed an acquired distinctiveness or secondary meaning.

138.     Likewise, the Wild America Mark has acquired a secondary meaning and/or acquired distinctiveness as being associated with content created by MSP.

139.     The National Geographic Defendants' Infringing Series have misappropriated MSP's protectable trade dress both in the packaging of the Infringing Series for sale and distribution and in the overall atmosphere of its programming.

140.     The National Geographic Defendants' Infringing Series have infringed the Wild America Mark by misleading consumers into believing the Infringing Series originates from, or is sponsored or approved by MSP.

141.     The National Geographic Defendants' conduct as alleged herein is likely to cause, and in fact has actually caused, confusion, mistake, or deception, as to origin, affiliation, sponsorship, or approval of the Infringing Series.

142.     The National Geographic Defendants' conduct constitutes a willful and knowing attempt to profit on the goodwill which MSP has developed in its Wild America Mark, and constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

143.     As a result of the National Geographic Defendants' conduct, MSP has suffered irreparable harm, including to its goodwill and reputation. MSP will continue to be harmed and consumers will continue to suffer confusion as to the origin, affiliation, sponsorship, or approval

of the Infringing Series, unless the National Geographic Defendants are enjoined from continuing such conduct.

144.    The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

145.    Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

146.    Pursuant to 15 U.S.C. § 1117, MSP is entitled to recover compensatory damages not to exceed three times its actual damages and the National Geographic Defendants' profits, to be established at trial, and reasonable attorney's fees and costs.

147.    As a result of the National Geographic Defendants' conduct, the National Geographic Defendants have caused and, unless restrained and enjoined by this Court under 15 U.S.C. § 1116, will continue to cause irreparable harm, damage, and injury to MSP.

148.    MSP has no adequate remedy at law to prevent the continued dilution of its Wild America Mark.

## FOURTH CAUSE OF ACTION
### Unfair Competition under Colorado Common Law

149.    MSP hereby realleges and reincorporates the entirety of the preceding paragraphs as if fully restated herein.

150.    The National Geographic Defendant's infringement of the Wild America Mark constitutes misappropriation of valuable property rights of MSP and trades on the goodwill symbolized by the Wild America Mark, and is thereby likely to confuse and deceive members of the consuming public as to the source of MSP's Wild America programming as a result of the

National Geographic Defendants' infringement of the Wild America Mark in conjunction with its Infringing Series.

151.    By virtue of the National Geographic Defendants' conduct, the National Geographic Defendants have engaged in unfair competition in violation of the state laws of the State of Colorado.

152.    The National Geographic Defendants' conduct in disregarding MSP's rights and in attempting to trade on the goodwill which MSP has developed, all to the damage of MSP constitutes willful and wanton behavior.

153.    The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

154.    Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

155.    MSP is entitled to compensatory damages as a result of the National Geographic Defendants' conduct, in an amount to be established at trial.

156.    As a result of the National Geographic Defendant's willful and wanton conduct, MSP is entitled to exemplary damages pursuant to Colo. Rev. Statute § 13-21-102.

157.    As a result of the National Geographic Defendants' conduct, the National Geographic Defendants have caused and, unless restrained and enjoined by this Court, will continue to cause irreparable harm, damage, and injury to MSP.

**FIFTH CAUSE OF ACTION**
**Deceptive Trade Practices**
**(Colo. Rev. Stat. § 6-1-101 *et seq.*)**

158.    MSP hereby realleges and reincorporates the entirety of the preceding paragraphs as if fully restated herein.

159.    MSP's Wild America Mark has been used since 1982 to designate the Wild America documentary series as originating from MSP. MSP has, at all times, been the source of Wild America documentary programming.

160.    The National Geographic Defendants' Infringing Series have infringed the Wild America Mark by misleading consumers into believing the Infringing Series originates from, is affiliated with, connected with, associated with, sponsored by, or otherwise approved by MSP.

161.    The National Geographic Defendants' conduct was done knowingly and in bad faith.

162.    The National Geographic Defendant's conduct in producing, distributing, and selling the Infringing Series, falsely represented the source, sponsorship, approval, or certification of the Infringing Series as being created by, or endorsed by MSP.

163.    The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

164.    Upon information and belief, the National Geographic Defendants have realized profits within the United States from the infringing content distributed internationally by causing those profits to flow back to the National Geographic Defendants.

165.    The National Geographic Defendants' conduct constitutes a deceptive trade practice, pursuant to Colo. Rev. Stat. § 6-1-101 *et seq.*

166.    As a result of the National Geographic Defendants' conduct, the National Geographic Defendants have caused and, unless restrained and enjoined by this Court, will continue to cause irreparable harm, damage, and injury to MSP.

167.    Pursuant to Colo. Rev. Stat. § 6-1-113, MSP is entitled to recover an amount equal to three times its actual damages, and reasonable attorney's fees and costs.

### SIXTH CAUSE OF ACTION
**Copyright Infringement**
**(17 U.S.C. § 101 *et seq.*)**

168.    MSP hereby realleges and reincorporates the entirety of the preceding paragraphs as if fully restated herein.

169.    MSP is, and at all times has been, the owner of a copyright over each episode of the Wild America half-hour documentary television series and the Wild America one-hour Specials.

170.    Specifically, MSP owns a copyright registration for the Wild America episode *Bighorn!* with associated U.S. Copyright Registration No. PA0000073236 (the "Infringed Work").

171.    As the exclusive owner of the copyright for the Infringed Work, MSP has exclusive rights to reproduce its programming, to prepare derivative works based upon the Infringed Work, to distribute the Infringed Work, and to perform and display the work contained within the copyrighted episode.

172.    The National Geographic Defendants deliberately and intentionally copied the visual imagery, the filming style, and the specific storylines of the Infringed Work in its Untamed Americas series.

173.    Specifically, the National Geographic Defendants have deliberately and intentionally copied the presentation order, emphasis, and purpose of the Infringed Work, by mimicking the structure of introducing an animal, tracking the animal, viewing the animal in conflict, and then providing information about that specific animal, in their Untamed Americas series.

174.    The National Geographic Defendants have deliberately and intentionally copied specific elements of the Infringed Work, including famous shots such as the big-horn rams head-butting one another, slow motion animal conflict scenes, and wide angle nature transition shots.

175.    The National Geographic Defendants have deliberately and intentionally copied elements from the Infringed Work in Episode 1 of the Untamed Americas series, *Mountains*.

176.    Specifically, the National Geographic Defendants have deliberately and intentionally copied the following elements:

  a.    the introduction to the episode, where two rams head-butt one another as the introductory music crescendos;

  b.    Voice-over narration of the episode by an iconic individual. The narration in both episodes begins immediately following the introductory credits. In *Bighorn!*, Marty Stouffer narrates the episode. In *Mountains*, actor Josh Brolin narrates the episode;

  c.    Segments focused on specific animals. *Bighorn*! includes a segment about a mouse taking care of its young; *Mountains* includes a segment about beaver taking care of its young.  Both *Bighorn!* and *Mountains* include a segment on bighorn sheep mating season;

d. Both episodes use the iconic nature slow-motion action shot popularized by Wild America, particularly during the segments on bighorn sheep. During those segments, both episodes feature a slow motion shot of two bighorn sheep ramming one another.

177. In addition to copying specific technical elements from individual Wild America episodes, the National Geographic Defendants have deliberately and intentionally copied the thematic elements and titles of many Wild America episodes.

178. While MSP's investigation remains ongoing and MSP reserves the right to amend this pleading upon further discovery of infringing conduct, MSP has already identified multiple Wild America episodes where the National Geographic Defendants have copied critical thematic elements and titles. For example, Wild America aired episodes titled *Wolverine Country*, *Canyon Creatures* and *The Wolf and the Whitetail*. The National Geographic Defendants subsequently aired America the Wild episodes of striking similarity titled *Wolverine King*, *Grand Canyon Safari*, and *Monster Wolf.*

179. As a result of the National Geographic Defendants' actions, consumers have been wrongly diverted away from MSP's Wild America in a variety of marketing outlets.

180. As a direct result of the National Geographic Defendant's actions in infringing MSP's copyright in the Infringed Work, MSP has sustained, and will continue to sustain, substantial injury, loss, and damages in an amount to be established at trial.

181. The National Geographic Defendants have distributed, and made available to purchase or to stream, the Infringing Series both within the United States and internationally.

182.     Upon information and belief, the National Geographic Defendants have realized profits within the United States from the content which it has distributed internationally, by causing those profits to flow back to the National Geographic Defendants.

183.     MSP is entitled to a permanent injunction restraining the National Geographic Defendants from engaging in further acts of copyright infringement, pursuant to 17 U.S.C. § 502.

184.     MSP is further entitled to recover from the National Geographic Defendants the actual damages suffered by MSP as a result of the infringement, the profits of the National Geographic Defendants that are attributable to their infringing activities, or statutory damages pursuant to 17 U.S.C. § 504.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for the following relief:

1.     The Court grant a permanent injunction enjoining and restraining the National Geographic Defendants from infringing MSP's Wild America Mark;

2.     The Court grant a permanent injunction enjoining and restraining the National Geographic Defendants from infringing the relevant Wild America copyrights;

3.     The Court grant MSP compensatory damages in an amount not to exceed three times MSP's actual damages and the National Geographic Defendants' profits, to be proved at trial;

4.     The Court grant MSP exemplary damages in an amount not to exceed an amount equal to MSP's actual damages, pursuant to Colo. Rev. Stat. § 13-21-102;

5.     The Court grant damages to MSP in an amount equal to three times the amount of actual damages sustained by MSP pursuant to Colo. Rev. Stat. § 6-1-113.

6.      The Court declare the Wild America Mark famous pursuant to 15 U.S.C. § 1125(c);

7.      The Court grant MSP statutory damages to the extent allowed by law pursuant to 17 U.S.C. § 504(c);

8.      The Court determine that Defendants' infringement of the Wild America Mark was both willful and intentional;

9.      The Court declare this case exceptional under 15 U.S.C. § 1117(a) and award MSP's reasonable attorneys' fees;

10.      The Court grant Plaintiffs a trial by jury on all issues so triable; and

11.      The Court enter such other and further relief as it deems just and proper

This the 5th day of December 2018.

/s/ Jeffrey S. Southerland
Jeffrey S. Southerland
NC State Bar No. 34221
jsoutherland@tuggleduggins.com
*Member of the U.S. District Court for the*
*District of Colorado Bar*
Alan B. Felts
N.C. State Bar No. 42826
afelts@tuggleduggins.com
*Member of the U.S. District Court for the*
*District of Colorado Bar*

*Attorneys for Plaintiffs*

OF COUNSEL:

Tuggle Duggins P.A.
100 N. Greene St., Suite 600
Greensboro, NC 27401
Telephone: (336) 378-1431
Facsimile: (336) 274-6590