# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 18-cv-3127-WJM-SKC

MARTY STOUFFER and
MARTY STOUFFER PRODUCTIONS, LTD,

     Plaintiffs,

v.

NATIONAL GEOGRAPHIC PARTNERS, LLC;
NGSP, INC.;
NGHT, LLC, d/b/a NATIONAL GEOGRAPHIC DIGITAL MEDIA;
NGHT DIGITAL, LLC;
NGC NETWORK US, LLC; and
NGC NETWORK INTERNATIONAL, LLC,

     Defendants.

---

## ORDER GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs Marty Stouffer and Marty Stouffer Productions, LTD (together, "Stouffer," unless the context requires otherwise), sue Defendants (collectively, "National Geographic") for trademark infringement, copyright infringement, and unfair competition.[1]  Currently before the Court is National Geographic's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint.  (ECF No. 23.)  For the reasons explained below, the Court:

-    denies National Geographic's motion without prejudice as to Stouffer's

      trademark causes of action—although the Court finds merit in the First

---

[1] National Geographic claims that Defendant NGHT Digital, LLC, "is unaffiliated with (and entirely unknown to)" the other Defendants.  (ECF No. 23 at 8 n.1.)

Amendment concerns National Geographic raises, the Court believes the test for accommodating such interests should be somewhat different than what National Geographic has advanced, and no party has had an opportunity to argue under the test formulated by this Court;

- grants National Geographic's motion with prejudice as to Stouffer's trade dress cause of action; and

- grants National Geographic's motion without prejudice as to Stouffer's copyright cause of action.

In light of these rulings, Stouffer will be given an opportunity to amend his complaint and National Geographic will be given another opportunity to move to dismiss.  Should National Geographic file that motion, the stay of discovery will remain in place until the motion is resolved.

## I.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169,

1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II.  BACKGROUND

Stouffer alleges substantially as follows.

### A.    The "Wild America" Series

Beginning in 1982 and continuing for the next fourteen years, the Public Broadcasting Service ("PBS") regularly televised the Wild America nature documentary series.  (¶¶ 28, 30.)[2]  During those fourteen years, Wild America "never fell out of the top ten most viewed television shows on PBS," and in some years it was "PBS's most-watched show."  (¶¶ 30–31.)

Wild America was produced by Plaintiff Marty Stouffer Productions, LTD, a company founded by Plaintiff Marty Stouffer and his brother, Mark, to produce nature documentaries.  (¶¶ 17, 19, 26–27.)[3]  "Throughout Wild America's fourteen year run, the Stouffer Brothers developed a unique filming style for the show, which utilized slow motion, close-ups, and time lapses to give viewers a more immersive experience than other nature and wildlife documentary programming."  (¶ 37.)  The series also became known for an image of two bighorn rams butting heads.  (¶ 137.)

When Wild America's run ended on PBS, the Stouffer Brothers continued to produce direct-to-video nature documentaries under the "Wild America" mark.  (¶ 33.)

---

[2] All "¶" citations, without more, are to the complaint (ECF No. 1).

[3] For unexplained reasons, Mark Stouffer is not a party to this lawsuit.

They also produced a feature film titled "Wild America," which depicted their childhood and the origins of their passion for nature and filmmaking.  (¶¶ 44–45.)

All Wild America episodes remain available to purchase on DVD, or to stream through major video-streaming platforms such as those run by Amazon, Google, and Apple.  (¶ 46.)  Through syndication, the original Wild America documentary series remains available to watch on television to this day.  (¶¶ 39, 41.)

Marty Stouffer Productions owns a trademark on "Wild America," which it federally registered in 1982.  (¶ 29.)

**B.      Stouffer's Discussions with National Geographic**

National Geographic launched a television station, commonly known as Nat Geo TV, in 2001.  (¶ 53.)  National Geographic launched a sister channel, Nat Geo WILD, in 2010.  (¶ 54.)  Both channels feature nature-oriented documentary programming. (¶¶ 53, 55.)

In 2010 and 2011, Stouffer and National Geographic "engaged in numerous discussions regarding [National Geographic] potentially licensing or purchasing" Stouffer's Wild America film library.  (¶ 59.)  National Geographic "declined to purchase the Wild America Film Library, but asked [Stouffer] to keep [National Geographic] apprised of any updates regarding the sale of the film library."  (¶ 60.)

**C.      National Geographic's "Wild"-Themed TV Programs**

On November 1, 2010, a Nat Geo TV executive e-mailed Stouffer, asking permission to title an upcoming natural history miniseries "Wild Americas" or "Wildest Americas."  (¶¶ 61–62.)  Stouffer responded "that Wild America was trademarked and that both of [the] titles proposed . . . would be too close to the Wild America Mark." (¶ 63.)  National Geographic ended up airing the series in 2012 under the title "Untamed

Americas" within the United States, and "Wild America" outside of the United States. (¶¶ 65–66.)  The series "can be purchased under the title Wild America and shipped into the United States" (¶ 68), but Stouffer does not allege that National Geographic has any control over such sales.

Stouffer, unaware of the Untamed Americas series, continued discussions with National Geographic in 2012 about licensing or selling the Wild America film library. (¶ 69.)  These discussions included "using Wild America footage to create content for a new, then-unnamed Nat Geo TV series starring television personality Casey Anderson." (¶ 70.)  These discussions did not bear fruit.  (¶ 71.)

In 2013, National Geographic released a television series titled "America the Wild."  (¶ 72.)  Stouffer says that America the Wild "replicat[es] the most minute details of Wild America in its production" (¶ 73), as illustrated by:

- "virtually indistinguishable" titles (¶ 74);

- "several episodes" of both series in which the host interacts with a grizzly bear that he raised from a cub (in the following still shots, Marty Stouffer/Wild America is on the left and Casey Anderson/America the Wild is on the right):




 

(¶¶ 75, 77);

- interacting with rams, supposedly "invoking the imagery from Wild
  America's introductory scene, in which two rams butt heads dramatically":

 

(¶ 77);[4]

- actual "copy[ing]" of "many iconic images from Wild America, including,
  among others, the image of two big horn sheep head-butting one another"
  (¶ 80), although Stouffer provides no side-by-side comparisons of such
  copying;

- a similar "structure" in "many" episodes, namely, "introducing an animal,
  following said animal, recording footage of the animal in conflict, and
  providing information about the animal" (¶ 81);

- "elements" such as "animal point of view camera shots, slow-motion action
  shots, anthropomorphized story-telling and presentation; [wide-angle

---

[4] The ram with which Casey Anderson butts heads is stuffed.  (*Id.*)

nature] transition scenes between segments; and close-up shots of animals in their native habitats" (¶¶ 82, 174);[5]

- the hosts "pos[ing] for a photo shoot" in the middle of an episode in a similar way:

 

(¶ 77);

- "an uncanny similarity between each show's host," with Casey Anderson adopting an "appearance and persona [that] closely resemble[s] the distinctive look and style of Marty Stouffer":

 

(¶ 79); and

- "a similar mark and style for DVD packaging":

---

[5] The Untamed Americas series likewise employed these elements. (¶ 82.)

 

(¶ 76).

In 2014, National Geographic premiered "Surviving Wild America," another nature-focused series.  (¶ 85.)  It features "two Australian hosts exploring the Okefenokee Swamp, located in the Southeastern region of the United States."  (¶ 86.)

In 2018, National Geographic premiered another nature documentary series, this one titled "America's Wild Frontier."  (¶ 87.)

The Court will refer to the four National Geographic TV series at issue here—Untamed Americas, America the Wild, Surviving Wild America, and America's Wild Frontier—as the "Accused Series."  (¶ 88.)  The Accused Series are available to purchase or stream through at least Amazon, Google, and Apple.  (¶ 95.)

## D.    Stouffer's Claims

Based on the foregoing, Stouffer brings six causes of action:

- federal trademark infringement (15 U.S.C. § 1114(1)) ("Claim 1");

- federal trademark dilution (15 U.S.C. § 1125(c)) ("Claim 2");

- federal unfair competition (15 U.S.C. § 1125(a)) ("Claim 3");

- unfair competition under Colorado common law ("Claim 4");

- violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* ("Claim 5"); and

- copyright infringement (17 U.S.C. § 501) ("Claim 6").

## III.  ANALYSIS

### A.    Trademark (Claims 1, 2, 4 & 5)

National Geographic first argues that every cause of action "relate[d] to the titles" of the Accused Series must fail because those titles are protected by the First Amendment.  (ECF No. 23 at 11.)[6]  National Geographic asserts that this covers all title-focused claims under the Lanham Act (apparently referring to Claims 1 and 2) and all "related claims (e.g., state law unfair competition, deceptive trade practices, and right of publicity claims etc.)" (apparently referring to Claims 4 and 5).  (*Id.* at 11 & n.9.) Stouffer responds that it is too early to consider National Geographic's First Amendment defense, and that he has otherwise adequately pleaded facts to resist the First Amendment defense.  (ECF No. 49 at 6–18.)  Stouffer does *not* argue, however, that National Geographic has improperly grouped Claims 1, 2, 4, and 5 for purposes of analysis.  Accordingly, the Court will likewise treat them together.

### 1.    Traditional Elements of Liability

Stouffer's Claim 1 is for infringement of a federally registered trademark.  The Lanham Act establishes a cause of action for such infringement as follows:

> Any person who shall, without the consent of the registrant—

>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with

_____

[6] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with separately numbered prefatory material such as a table of contents.

the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. . . .

15 U.S.C. § 1114(1).

The ultimate question for liability under this cause of action is whether the party accused of infringement (often called the "junior user") is likely to cause confusion by its use of the registrant's (the "senior user's") mark.  Courts in the Tenth Circuit evaluate likelihood of confusion under the six "*King of the Mountain*" factors:

(a) the degree of similarity between the marks;

(b) the intent of the alleged infringer in adopting its mark;

(c) evidence of actual confusion;

(d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;

(e) the degree of care likely to be exercised by purchasers; and

(f) the strength or weakness of the marks.

*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir. 1999).

Stouffer's Claim 2 is for dilution of a federally registered mark.  As to that, the Lanham Act provides as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

Stouffer's Claim 4 is for unfair competition under Colorado common law. To sustain such a cause of action, "a plaintiff must show that its name has acquired a secondary meaning and that the defendant has unfairly used the name, or a simulation of it, against the plaintiff. The use of the same or a similar name is unfair if the public is likely to be deceived by its use." *Gregg Homes, Inc. v. Gregg & Co. Builders*, 978 P.2d 146, 147 (Colo. App. 1998).

Stouffer's Claim 5 is for violation of the CCPA. The elements of a private CCPA cause of action are usually stated as follows:

> (1) that the defendant engaged in an unfair or deceptive trade practice;
>
> (2) that the challenged [unfair or deceptive] practice occurred in the course of defendant's business, vocation, or occupation;
>
> (3) that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
>
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
>
> (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003); *but see Flores v. Bank of Am., N.A.*, 2019 WL 2470923, at *12–13

(D. Colo. June 13, 2019) (questioning whether the CCPA proscribes "unfair" trade practices that are not also "deceptive").

>   2.   The Second Circuit's *Rogers* Test for Claims that an Artistic Work Infringes a Trademark

Here, National Geographic urges the Court to adopt the approach of a number of other circuits—an approach the Tenth Circuit has apparently never considered directly—that imposes a First Amendment-based restriction on Lanham Act liability and similar state-law liability when the defendant uses the plaintiff's mark in artistic and similarly expressive contexts.

This line of authority begins with *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). The *Rogers* lawsuit centered on Federico Fellini's 1986 film, *Ginger and Fred*, about a fictional pair of Italian cabaret dancers that became known in Italy as "Ginger and Fred" because they imitated the dance routines of Fred Astaire and Ginger Rogers. *Id.* at 996–97. Ginger Rogers sued the film's producers under a Lanham Act theory, arguing that they had "creat[ed] the false impression that the film was about her or that she sponsored, endorsed, or was otherwise involved in the film." *Id.* at 997. The district court rejected the claim on First Amendment grounds, and the Second Circuit affirmed. *Id.* at 996–97

The Second Circuit viewed the matter as entirely a question of whether the film's title, rather than its screenplay, violated the Lanham Act. *Id.* at 997; *see also id.* at 1005 (Griesa, J., concurring in judgment) (explaining how the issues in the lawsuit became narrowed to the question of the title alone). "Titles," the court said, are, "like the artistic works they identify," a "hybrid" form of communication, "combining artistic expression and commercial promotion. The title of a movie may be both an integral element of the

film-maker's expression as well as a significant means of marketing the film to the public.  The artistic and commercial elements of titles are inextricably intertwined." *Id.* at 998.  "Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values," the Second Circuit concluded that it "must construe the Act narrowly to avoid such a conflict." *Id.*

The Second Circuit accordingly established a two-part test.  **First**, does the title have "some artistic relevance" (later described as "the appropriately low threshold of minimal artistic relevance") to "the underlying work"? *Id.* at 999.  If not, the traditional likelihood-of-confusion factors apply.  But if so, then **second**, does "the title explicitly mislead[] as to the source or the content of the work"? *Id.*  If the answer to this second question is "yes," the traditional likelihood-of-confusion factors apply.  *Id.* at 1000 n.6.  If the answer is "no," then "the danger of restricting artistic expression" outweighs the likelihood-of-confusion factors as a matter of law.  *Id.* at 999–1000.[7]

The Fifth, Sixth, Ninth, and Eleventh Circuits have adopted the *Rogers* approach to trademark disputes where a ruling in favor of the mark's owner might chill First Amendment expression.  *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664–65 (5th Cir. 2000) ("Polo" clothing trademark versus a wealthy lifestyle magazine named "Polo"); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) (Tiger Woods versus a painter who made a painting depicting various scenes from Woods's record-setting 1997 win at The Masters); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901–02 (9th Cir. 2002) (Barbie versus the song "Barbie Girl," by Aqua); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir.

---

[7] Applying this test, the Second Circuit held that the First Amendment protected the film's title from Rogers's Lanham Act claim.  *Id.* at 1000–02.

2012) (famous college football team's uniforms versus a painter who painted that football team in various settings).   No party has cited a case in which a court rejected the *Rogers* approach when presented with an artistic use of a trademark.   *But see PAM Media, Inc. v. Am. Research Corp.*, 889 F. Supp. 1403, 1406 (D. Colo. 1995) (in the context of a dispute over the name of a radio talk show, stating that "[t]he *Rogers* case is not persuasive precedent because a radio talk show is fundamentally different from those forms of expression generally characterized as artistic works.   Books, plays, movies and most television programs have established form and content.   Story lines, pictorial images and articulated ideas give meaning to their titles.   Any given title may be considered in the context of the work taken as a whole. [¶] That may not be said of a talk radio show.").

Stouffer argues that the Tenth Circuit's decision in *Cardtoons, L.C. v. Major League Baseball Players Association*, 95 F.3d 959 (10th Cir. 1996), shows that the Tenth Circuit has at least implicitly rejected *Rogers*.   (ECF No. 49 at 11.)   *Cardtoons* involved baseball card parodies, such as one featuring "Treasury Bonds," a player for the "Gents," with a picture on the front that was unmistakably a caricature of Barry Bonds of the San Francisco Giants.   95 F.3d at 962–63.   The bulk of the Tenth Circuit's analysis did *not* focus on the Lanham Act because it found that the parody cards were not likely to be confused with licensed baseball cards.   *Id.* at 967.   The major focus, rather, was an Oklahoma statutory right of publicity.   *Id.* at 967–76.

The Tenth Circuit agreed with the manufacturer of the parody cards that the First Amendment placed some limits on a state's ability to protect the right of publicity.   *Id.* at 968–70.   "In resolving the tension between the First Amendment and publicity rights in

this case," the court found "little guidance in cases involving *parodies* of other forms of intellectual property.  Trademark and copyright, for example, have built-in mechanisms that serve to avoid First Amendment concerns *of this kind*."  *Id.* at 970 (emphasis added).  In the trademark context, "proof of trademark infringement under the Lanham Act requires proof of a likelihood of confusion, but, *in the case of a good trademark parody, there is little likelihood of confusion*, since the humor lies in the difference between the original and the parody."  *Id.* (emphasis added).

Stouffer says that, "far from being an analogous to . . . the *Rogers* test," this language from *Cardtoons* shows that the Tenth Circuit "believed First Amendment concerns could be sufficiently addressed under a traditional likelihood of confusion test." (ECF No. 49 at 11.)  However, the language the Court italicized in the above quotations from *Cardtoons* shows that the Tenth Circuit had nothing but trademark parodies in mind when it said that the likelihood-of-confusion test would be enough to satisfy First Amendment concerns.  Moreover, later in the *Cardtoons* opinion, the court cited *Rogers* with approval (but without elaboration) for the general notion that "the public's interest in free expression" needed protection in the context presented.  *See* 95 F.3d at 971.  The court went on to hold that the First Amendment rights of the parody card manufacturer outweighed the baseball players' state-created right to control their likenesses.  *Id.* at 972–76.

Ultimately, in the Court's view, *Cardtoons* neither adopts nor casts doubt on *Rogers*.  In other words, nothing in *Cardtoons* prevents this Court from adopting the *Rogers* test.

Stouffer points to a second Tenth Circuit opinion that he believes makes his point

more clearly, *Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045 (10th Cir. 2008).  (*See* ECF No. 49 at 12.)  In this case, a volunteer organization dedicated to defending the Mormon Church set up a parody website mocking an organization dedicated to criticizing the Mormon Church.  527 F.3d at 1049.  On an appeal from a summary judgment order, the Tenth Circuit applied its traditional six-factor likelihood-of-confusion analysis and held that the plaintiff had not presented evidence from which a jury could conclude that the parody website was likely to cause confusion within the meaning of the Lanham Act.  *Id.* at 1054–57.  The Tenth Circuit nowhere mentioned *Rogers* or the First Amendment.

Stouffer says that *Utah Lighthouse Ministry* shows that "the Tenth Circuit has[,] instead [of adopting *Rogers*], opted to incorporate a defendant's right to artistic expression into the overall analysis of weighing the likelihood of confusion factors." (ECF No. 49 at 12–13.)  This is incorrect.  *Utah Lighthouse Ministry* is a parody case. *Cardtoons* said that the likelihood-of-confusion analysis for a parody case would be enough to accommodate First Amendment concerns, *see* 95 F.3d at 970, and *Utah Lighthouse Ministry*, true to that prediction in the context of a parody case, applied a standard likelihood-of-confusion analysis—there is no hint in the opinion that the Tenth Circuit had First Amendment concerns in mind.

In sum, *Cardtoons* and *Utah Lighthouse Ministry* have nothing to say directly, and barely anything to say indirectly, about the *Rogers* test.  Because the Tenth Circuit (and the Supreme Court) have neither adopted nor rejected the *Rogers* test, this Court remains free to decide whether the *Rogers* test should apply in this case.

   3.   Developments in Case Law Applying *Rogers*

Before the Court decides whether to adopt the *Rogers* test, it finds that the

following case law should be kept in mind.  Each case illustrates where the "play in the joints" of the *Rogers* test might be found.

The first of these cases is *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003), and it explores the first *Rogers* inquiry: artistic relevance.  In 1998, OutKast released a song titled "Rosa Parks," which seemed to have nothing to do with the iconic civil rights activist other than a line in the chorus, "Everybody move to the back of the bus."  *Id.* at 442–43.  Parks, of course, is celebrated because she did *not* move to the back of the bus.  She brought a Lanham Act claim against the record label for misuse of her identity, and the district court eventually entered summary judgment for the record label on its *Rogers* defense.  *Id.* at 444.

The Sixth Circuit reversed:

> It is true that the phrase "move to the back of the bus" is repeatedly used in the "hook" or chorus of the song.  When the phrase is considered *in the context of the lyrics*, however, the phrase has absolutely nothing to do with Rosa Parks.  There could be no stronger, no more compelling, evidence of this fact than the admission of "Dré" (André "Dré" Benjamin) that, "We (OutKast) never intended for the song to be about Rosa Parks or the civil rights movement. It was just symbolic, meaning that we comin' back out, so all you other MCs move to the back of the bus."  The composers did *not* intend it to be about Rosa Parks, and the lyrics are *not* about Rosa Parks.  The lyrics' sole message is that OutKast's competitors are of lesser quality and, therefore, must "move to the back of the bus," or in other words, "take a back seat."  We believe that reasonable persons could conclude that there is no relationship of any kind between Rosa Parks' name and the content of the song—a song that is nothing more and nothing less than a paean announcing the triumph of superior people in the entertainment business over inferior people in that business.

*Id.* at 452–53 (record citations and footnote omitted; emphasis in original).  The Sixth Circuit thus found under *Rogers*'s artistic relevance inquiry that a genuine issue of

material fact existed whether the song title was "artistically related to the content of the song or whether the use of the name Rosa Parks [was] nothing more than a misleading advertisement for the sale of the song." *Id.* at 458. The court stated, however, that "if the finder of fact determines that the title is artistically relevant to the song's content, then the [*Rogers*] inquiry is at an end because the title is not explicitly misleading as to the content of the work." *Id.* at 459 (internal quotation marks omitted).

The Court next turns to a Ninth Circuit case, *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 61 (2018), that addresses what it means to be explicitly misleading under the second prong of *Rogers*. But understanding the Ninth Circuit's decision requires briefly circling back to *Rogers* and then addressing a Second Circuit case decided only months after *Rogers*.

The competing "marks" in *Rogers* were Ginger Rogers's first name and Fellini's film titled *Ginger and Fred*. In other words, it was *not* the title of one work versus the title of another. But footnote 5 of the *Rogers* opinion offered some interesting *dicta* about this titles-to-titles problem: "This limiting construction [*i.e.*, the two-part test now known as the *Rogers* test] would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n.5.

The scope of this footnote arose a few months after *Rogers* when the Second Circuit decided a trademark infringement case in which the publisher of the "Cliffs Notes" study guides—who had trademarked those books' "distinctive yellow color, black

diagonal stripes and black lettering"—sued the publisher of "Spy Notes," a parody that used the same yellow and black layout on its cover. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 492 (2d Cir. 1989). The plaintiff argued that the use of exactly the same cover design was analogous to the "misleading titles that are confusingly similar to other titles" spoken of in *Rogers*'s footnote 5, and so the usual likelihood-of-confusion test would apply, rather than any First Amendment test. *Id.* at 494.

The Second Circuit interpreted *Rogers*'s footnote 5 to mean only that *Rogers*'s second prong—the "explicitly misleading" test—"is inapplicable" in the circumstance that footnote 5 describes. *Id.* "But that does not mean," the court continued, "that nothing in the *Rogers* opinion is relevant to this case." *Id.* In this vein, the court went on to announce that, "in deciding the reach of the Lanham Act in *any* case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Id.* (emphasis added). Having announced as much, the court conducted a *de novo* likelihood-of-confusion analysis with a thumb on the scale of First Amendment interests and concluded that the factors favored the defendant. *Id.* at 494–97.

With this background, the Court returns to the Ninth Circuit's *Twentieth Century Fox* decision, decided twenty-eight years after *Rogers* and *Cliffs Notes*. The dispute was between Fox, as producer of the "Empire" TV series, and the record label of the same name. *See Twentieth Century Fox*, 875 F.3d at 1195. Fox's TV series "portrays a fictional hip hop music label named 'Empire Enterprises' that is based in New York." *Id.* But Empire (formally, "Empire Distribution") is also a real-life music label "that

records and releases albums in the urban music genre, which includes hip hop, rap, and R&B." *Id.* Empire threatened to sue Fox, and the latter chose to sue first, seeking a declaratory judgment of non-infringement. *Id.* The district court eventually granted summary judgment in Fox's favor. *Id.*

On appeal, Empire attempted to persuade the Ninth Circuit that the *Rogers* test (which the Ninth Circuit had adopted in *Mattel*, *supra*) should not apply, offering arguments that featured *Rogers*'s footnote 5. *Id.* at 1197. The Ninth Circuit rejected the argument by characterizing footnote 5 as essentially a dead letter which the Second Circuit itself disavowed in the *Cliffs Notes* case: "This footnote has been cited only once by an appellate court since *Rogers*, in a case in which the Second Circuit itself rejected its applicability and applied the *Rogers* test." *Id.* at 1197 (citing *Cliffs Notes*, 886 F.2d at 494–95). This Court does not read *Cliffs Notes* so broadly—*Cliffs Notes* stepped through a likelihood-of-confusion analysis, which it would not have needed to do if it had disavowed *Rogers*'s footnote 5.

In any event, the Ninth Circuit also criticized footnote 5 as "ill-advised or unnecessary: identifying misleading titles that are confusingly similar to other titles has the potential to duplicate either the likelihood-of-confusion test or the second prong of *Rogers*, which asks whether a title explicitly misleads as to the source or the content of the work." *Id.* (internal quotation marks omitted). If the Court understands the Ninth Circuit correctly, it finds footnote 5 somewhat illogical in that it appears to call for a likelihood-of-confusion analysis to decide *whether* the *Rogers* approach applies, at least in a title-versus-title dispute.

Finally, the Ninth Circuit reasoned that footnote 5 "conflicts with our precedents,

which dictate that we apply the *Rogers* test in Lanham Act § 43(a) cases involving expressive works." *Id.* (internal quotation marks omitted; alterations incorporated).[8] The court thus applied the *Rogers* test without modification. *Id.* at 1197–99.

Applying *Rogers*, the court easily found artistic relevance: "[T]he show's setting is New York, the Empire State, and its subject matter is a music and entertainment conglomerate, 'Empire Enterprises,' which is itself a figurative empire." *Id.* at 1198. As for the "explicitly misleading" prong, the TV show "contain[ed] no overt claims or explicit references to Empire Distribution, [it was] not explicitly misleading," and thus protected by *Rogers*. *Id.* at 1199. The phrases "overt claims" and "explicit references" trace to *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013), a dispute between NFL great Jim Brown and the video game company that placed his likeness in *Madden NFL*, where the Ninth Circuit phrased the "explicitly misleading" test as follows: "We must ask . . . whether there was an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused such consumer confusion." *Id.* at 1245. In *Brown*, the Ninth Circuit was quoting *Rogers*, where the Second Circuit noted the lack of any "explicit indication," "overt claim," or "explicit misstatement" in the title of *Ginger and Fred*. 875 F.2d at 1001.

The final case the Court finds helpful to review is *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018), in which the fearsome "Honey Badger" cornered the Ninth Circuit, forcing it to reevaluate its criticism of *Rogers*'s footnote 5 and its formulation of the "explicitly misleading" prong. The plaintiff was Christopher Gordon, narrator of the popular YouTube video, *The Crazy Nastyass Honey Badger*, and its sequels. *Id.*

---

[8] Lanham Act § 43(a) refers to 15 U.S.C. § 1125(a).

at 261.  Gordon trademarked his famous phrase, "Honey Badger Don't Care," as applied to numerous types of goods, including greeting cards.  *Id.*  The defendant was a greeting card publisher that created cards incorporating slight variations on the "Honey Badger Don't Care" phrase (*e.g.*, "Honey Badger and me just don't care").  *Id.* at 262–63.  At summary judgment, the district court ruled in favor of the defendant under *Rogers*.  *Id.* at 263.  The Ninth Circuit reversed.

Applying *Rogers*, the Ninth Circuit quickly found that use of "Honey Badger Don't Care" was at least minimally artistically relevant to the defendant's greeting cards: "Each of defendants' cards relies on graphics and text to convey a humorous message through the juxtaposition of an event of some significance—a birthday, Halloween, an election—with the honey badger's aggressive assertion of apathy."  *Id.* at 268–69.  At the "explicitly misleading" prong, however, the analysis became much more complicated.

First, the Ninth Circuit backed away from what its previous cases seemed to require for "explicitly misleading" use: an overt claim or explicit reference.  "Such a statement may be sufficient to show that the use of a mark is explicitly misleading, but it is not a prerequisite." *Id.* at 269.[9]

Second, the Ninth Circuit announced that, "[i]n some instances, *the use of a mark alone* may explicitly mislead consumers about a product's source *if consumers would ordinarily identify the source by the mark itself.*"  *Id.* at 270 (emphasis added).  This is a significant innovation, given the Ninth Circuit's previous statement that "the mere use of

---

[9] The Ninth Circuit's only citation for this proposition was an opinion piece from Prof. McCarthy (contained within his seminal treatise) arguing that the *Rogers* test favors the junior user too heavily.  *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10:17.10 (5th ed., June 2019 update) ("*McCarthy on Trademarks*").

a trademark alone *cannot* suffice to make such use explicitly misleading." *E.S.S. Entm't 2000 v. Rock Star Videos*, 547 F.3d 1095, 1100 (9th Cir. 2008) (emphasis added).  The court narrowed that principle to its factual context by saying that "it was clear [in *E.S.S.*, which involved the use of a mark on a building depicted in a videogame] that consumers would not view the mark alone as identifying the source of the artistic work." *Gordon*, 909 F.3d at 270.

Third, in this context, the court appeared to reaffirm one of its previous statements that "consumers 'do not expect [titles] to identify' the 'origin' of the work," or in other words, that titles are not among the uses of marks that can be *inherently* "explicitly misleading." *Id.* (quoting *Mattel*, 296 F.3d at 902) (alteration in original).  But then the court went on to approvingly quote *Rogers* footnote 5 for the proposition "that 'misleading titles that are confusingly similar *to other titles*' can be explicitly misleading, regardless of artistic relevance." *Id.* (emphasis in original).

Fourth, the Ninth Circuit decided that the "relevant consideration" in deciding whether the use of the mark alone can be explicitly misleading "is the degree to which the junior user uses the mark in the same way as the senior user." *Id.*  As an example, it provided a hypothetical factual variation on the "Empire" case: What if, instead of "Empire," Fox had titled its TV series "Law & Order: Special Hip-Hop Unit," thus trading on the goodwill of NBC's Law & Order franchise, and specifically the "Law & Order: Special Victims Unit" TV series?  *Id.* at 270 & n.10.  This, the court said, might fall into the explicitly misleading category without any separate, overt claim to an association with Law & Order.  *Id.* at 270.

Fifth, the Ninth Circuit prescribed "[a] second consideration relevant to the

'explicitly misleading' inquiry," namely, "the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself." *Id.*

Ultimately, the Ninth Circuit sent the case back to the district court for trial: "There is at least a triable issue of fact as to whether defendants simply used Gordon's mark with minimal artistic expression of their own, and used it in the same way that Gordon was using it—to identify the source of humorous greeting cards in which the bottom line is 'Honey Badger don't care.'" *Id.* at 271. If the jury so found, then the defendant's use of Gordon's trademarked phrase would be "explicitly misleading." *Id.*

### 4. Whether to Adopt *Rogers* or Some Other Test to Protect First Amendment Values in the Trademark Context

Considering the parties' arguments and the case law the Court has reviewed, the Court finds that it must ask itself three questions.

First, does the Lanham Act need a limiting construction to protect First Amendment interests? On this, the Court agrees with *Rogers* that the answer is "yes." The traditional multi-factor likelihood-of-confusion test takes no account for First Amendment interests at all, yet the First Amendment requires that there be some leeway—in other words, that even demonstrable likelihood of confusion be tolerated to some extent, so as not to chill protected expression. *See Rogers*, 875 F.2d at 1001 ("To the extent that there is a risk that the title will mislead some consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression."); *see also ETW Corp.*, 332 F.3d at 937 & n.19 (holding survey evidence showing that as many as 62% of the public think that paintings showing Tiger Woods are endorsed by him was not enough to avoid First Amendment concerns: "The risk of misunderstanding, not engendered by

any explicit indication on the face of the print, is so outweighed by the interest in artistic expression as to preclude application of the [Lanham] Act.").

Second, must the First Amendment-based limiting construction on the Lanham Act lead to a test that a court may apply before trial, as opposed to first adjudicating the case under the traditional likelihood-of-confusion factors and only reaching the First Amendment question if such confusion is found?[10]  The Court concludes that the answer is "yes, ideally," with the "ideally" qualification reflecting the need to balance the parties' interests.  The First Amendment requires that likelihood of confusion be tolerated in some circumstances, but if the test is too simple and mechanical, it creates the risk that senior users of a mark end up with essentially no protection every time the junior user claims an artistic use.  On the other hand, the traditional likelihood-of-confusion test often creates a fact question that cannot be resolved without a trial.  *See, e.g.*, *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972–76 (10th Cir. 2002).  If a junior user must wait that long to find out if the First Amendment protects his or her use of the mark, it might unduly chill expression.  It might also provide an incentive for a senior user to bring a so-called "SLAPP," or strategic lawsuit against public participation, in the guise of a trademark dispute.  Thus, the First Amendment-based limiting construction on the Lanham Act should provide a test that can be applied as early as possible in the lawsuit, to the extent consistent with both parties' interests.

Third, is the *Rogers* test the right test?  This Court has the luxury of thirty years of court decisions applying *Rogers*, demonstrating its strengths and weaknesses.  The

---

[10] Although arising in a very different context, the concept of qualified immunity comes to mind.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (qualified immunity "is an immunity from suit rather than a mere defense to liability," and its applicability should be "resolv[ed] . . . at the earliest possible stage in litigation" (internal quotation marks omitted; emphasis removed)).

*Parks* and *Gordon* decisions, in particular, convince the Court that *Rogers* should not be adopted as-is.

In every other decision the Court has reviewed besides *Parks*, *Rogers*'s first prong—minimal artistic relevance—is treated as an objective question of law.  But *Parks* treated it as a question of fact because discovery supposedly showed that the lyric, "move to the back of the bus," had no genuine connection to Rosa Parks.  It is not clear to this Court that the title "Rosa Parks" has *zero* artistic relevance to a song that repeats the phrase multiple times, "move to the back of bus."  *Cf. E.S.S.*, 547 F.3d at 1100 ("the level of [artistic] relevance merely must be above zero").  In this Court's opinion, the Sixth Circuit's analysis was motivated by the fact that the artistic purpose one might glean, objectively speaking, was subjectively *irrelevant* to the song's creators.  This raised the strong suspicion that the title "Rosa Parks" was chosen entirely for its attention-grabbing value, not with any artistic motive.  But the *Rogers* test forced the Sixth Circuit to hang its hat on the minimal artistic relevance prong because the explicitly misleading prong could not apply.  That analysis, on its own terms, presents a square-peg/round-hole problem, but this Court is not similarly constrained by *Rogers*.  And in that light, the Court agrees with the Sixth Circuit's broader implicit point, namely, that there must be some way of addressing instances where there appears to be a demonstrable lack of artistic motive.

The Court views the Ninth Circuit's *Gordon* decision similarly.  *Gordon* is analytically messy and divorces "explicitly misleading" from its plain meaning— converting it into a mere label applied to uses of a mark that satisfy the first *Rogers* inquiry but not the second.  But *Gordon*, like *Parks*, was constrained by precedent while

trying to prevent what it suspected to be an abuse of *Rogers*.  *Gordon* therefore makes its point through an awkward attempt to avoid looking like it is overruling what it does not have the power to overrule.  But *Gordon*'s underlying point is a good one: it seems intuitively incorrect that the junior user may *always* lawfully use the senior user's mark where there is minimal artistic relevance, objectively speaking, and a lack of any overtly misleading claim about source, sponsorship, etc.  *Gordon* is also correct at least to *suspect* non-artistic motives where the junior user uses the mark in the same channels, and in basically the same way, as the senior user.  *See* 909 F.3d at 270–71.

In the Court's view, then, the *Rogers* test needs adapting to the legitimate considerations brought out in subsequent cases.  Thus adapted, the Court believes that the appropriate question to ask is: Did the junior user have a genuine artistic motive for using the senior user's mark or other Lanham Act-protected property right?  Among the relevant questions a court may ask when discerning the junior user's motives include the following:

- Do the senior and junior users use the mark to identify the same kind, or a similar kind, of goods or services?  *See id.* at 270.  This factor is akin to the fourth *King of the Mountain* factor, "the relation in use and the manner of marketing between the goods or services marketed by the competing parties."  185 F.3d at 1089.

- To what extent has the junior user "added his or her own expressive content to the work beyond the mark itself."  *Gordon*, 909 F.3d at 270; *cf. Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 158–70 (3d Cir. 2013) (discussing in detail the "transformative use" test used to weigh First Amendment

interests in state-law right of publicity cases).

- Does the timing of the junior user's use in any way suggest a motive to capitalize on popularity of the senior user's mark? *Cf. Gordon*, 909 F.3d at 262.

- In what way is the mark artistically related to the underlying work, service, or product? *Cf. Rogers*, 875 F.2d at 1001.

- Has the junior user made any statement to the public, or engaged in any conduct known to the public, that suggests a non-artistic motive? This would include "explicitly misleading" statements, as defined before *Gordon*, but is not confined to that definition.

- Has the junior user made any statement *in private*, or engaged in any conduct *in private*, that suggests a non-artistic motive? *Cf. Parks*, 329 F.3d at 452–53.

Notably, artistic relevance to the underlying work, service, or product is only a factor to consider here, not a threshold inquiry. In the Court's view, at least two problems arise from declaring "minimal artistic relevance" to be a threshold determination.

First, it can create an unwarranted distinction depending on how abstract the underlying work is. If a jazz trio writes a wordless piece titled "Rosa Parks," how does one judge the artistic relevance of that title? Is the title obviously irrelevant (because there are no words in which to ground a finding of relevance) or is it at least arguably relevant (because there are no words through which to confirm a finding of irrelevance)? If it is arguably relevant, what do the arguments turn on? Is one style of jazz more

reminiscent of Rosa Parks than another?  As these rhetorical questions illustrate, "artistic relevance" sometimes raises more problems than it resolves.

Second, incongruity, irrelevance, and randomness can themselves be artistic choices.  Imagine that the jazz trio names a suite of new pieces after toothpaste brands that a member of the trio encountered one day at the grocery store.  It is difficult to say that the trio's choice to associate itself with the randomly mundane can never have artistic or expressive value.  Thus, "artistic relevance" is one factor to consider when evaluating whether the junior user acted on a genuine artistic motive or, in contrast, on a desire to profit from the senior user's goodwill.

Although the foregoing test is framed in terms of the junior user's state of mind, the Court further holds that, to adequately protect First Amendment interests, the objective facts may sometimes excuse further inquiry into the junior user's subjective motives.  Take Fellini's *Ginger and Fred*.  The title has obvious artistic relevance to the story of the film, which is almost entirely Fellini's original expressive content, and there was no evidence of misleading marketing of the film.  *See Rogers*, 875 F.3d at 1001. Also, as far as the *Rogers* opinion reveals, there was no evidence of a competing product or service with which the film might conflict, nor that Fellini was attempting to ride any wave of popularity.  It would thus be appropriate to hold that *even if* it had been proven that Fellini's true motivation all along was a desire to tap into Ginger Rogers's fame, the title is protected by the First Amendment.  In other words, all else being equal, it should be a rare case in which a junior user with a "pure heart" receives First Amendment protection but a junior user with a "black heart" does not.  The First Amendment places the thumb on the scale of expressive use, even if at the expense of

sometimes allowing junior users with subjectively "unartistic" motives to avoid Lanham Act liability.

If the test prescribed above favors the senior user, the parties would go on to the traditional likelihood-of-confusion factors. But if the test favors the junior user, the inquiry ends—there can be no Lanham Act liability.[11]

5.    Application to the Present Dispute

Because the parties could not anticipate that this Court would propose the foregoing test, Stouffer has not had a chance to plead with this test in mind[12] and National Geographic has never had a chance to move to dismiss under this test. Although the parties' briefs give the Court some idea of what they would argue, the Court finds it most prudent to give Stouffer an opportunity to amend his complaint and National Geographic an opportunity to move to dismiss under the new test (regardless of whether Stouffer amends).

Without prejudging the issue, the Court also notes that this case may turn on concerns unrelated to the First Amendment, such as statutory fair use—to the extent National Geographic can be said to be using its titles "otherwise than as a mark," *see* 15 U.S.C. § 1115(b)(4)—and similar concepts, *cf. Warner Publ'n v. Popular Publ'ns*,

---

[11] The Court recognizes that some cases treat the *Rogers* test, if satisfied by the junior user, as a particularly weighty additional factor in the likelihood-of-confusion analysis, not a replacement for such analysis. *See, e.g., Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) ("The question then is whether the title is misleading . . . . This determination must be made, in the first instance, by application of the venerable *Polaroid* factors [the Second Circuit's analog to the Tenth Circuit's *King of the Mountain* factors]. However, the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." (citations and footnote omitted)). The Court disagrees with this approach as ultimately unworkable in practice.

[12] The Court does not mean to imply that a plaintiff has the burden to plead around a First Amendment defense. Nonetheless, plaintiffs often plead with expected defenses in mind, and Stouffer has never had that opportunity.

87 F.2d 913, 915 (2d Cir. 1937) ("In . . .  magazine titles, and particularly in the 'pulp'

magazine field, descriptive titles so crowd one another that resemblance in meaning is

inevitable.  The defendant has as good a right to a descriptive title as has the plaintiff.");

*Field Enters. Educ. Corp. v. Cove Indus., Inc.*, 297 F. Supp. 989, 995 (E.D.N.Y. 1969)

("Here, it is apparent that the word 'World' [in 'Illustrated World Encyclopedia'] has been

used by the defendant in its primary sense, i.e., pertaining to the earth and its contents.

There has been no trademark infringement [of the 'World Book' mark]."); *see also First*

*Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 653–54 (10th Cir. 1996).

For these reasons, National Geographic's motion is denied without prejudice as

to Stouffer's Claims 1, 2, 4, and 5.

## B.    Trade Dress (Claim 3)

National Geographic next argues that Stouffer's federal unfair competition cause

of action (Claim 3) fails to state a claim.  (ECF No. 23 at 18–27.)[13]  Stouffer's Claim 3

arises from the following section of the Lanham Act:

> Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any
> word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of
> fact, which—
>
>     (A) is likely to cause confusion, or to cause mistake, or to
> deceive as to the affiliation, connection, or association of
> such person with another person, or as to the origin,

---

[13] National Geographic also directs this argument at Stouffer's state-law causes of action
(Claims 4 and 5) to the extent they sweep broader than the titles of the Accused Series.  (*Id.* at
18 & n.9.)  The Court sees nothing in Claims 4 and 5 that extends beyond the titles of the
Accused Series.  Rather, the basis of Claims 4 and 5 is National Geographic's "infringement of
the Wild America Mark."  (¶¶ 150, 159–60.)  Accordingly, there is no analysis needed for Claims
4 and 5 beyond Part III.A, above.  Finally, National Geographic says that the same arguments
doom Claim 6 (copyright infringement).  (*Id.* at 18.)  The Court will address Claim 6 separately in
Part III.C, below.

> sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). This statute encompasses "two major and distinct types of unfair competition: (1) infringement of unregistered trademarks, names and trade dress, and (2) false advertising." 1 *McCarthy on Trademarks* § 4:6 (internal quotation marks omitted).

The allegations of Claim 3 make clear that Stouffer—to the extent he is not merely duplicating his claim for infringement of the "Wild America" mark—is alleging trade dress infringement:

> Some of Wild America's most iconic imagery and branding, including but not limited to, the image of two big-horn rams butting head[s] and host Marty Stouffer's on-screen persona constitute protectable trade dress which has developed an acquired distinctiveness or secondary meaning.
>
> Likewise, the Wild America Mark has acquired a secondary meaning and/or acquired distinctiveness as being associated with content created by [Stouffer].
>
> The National Geographic Defendants' [Accused] Series have misappropriated [Stouffer's] protectable trade dress both in the packaging of the [Accused] Series for sale and distribution and in the overall atmosphere of its programming.
>
> The National Geographic Defendants' [Accused] Series have infringed the Wild America Mark by misleading consumers into believing the Infringing Series originates from, or is sponsored or approved by[,] [Stouffer].

(¶¶ 137–40.)[14]

Trade dress claims come in three basic forms: (1) "the overall appearance of labels, wrappers, and containers used in packaging a product"; (2) "a combination of any elements in which a product or service is presented to the buyer"; and (3) "the shape and design of the product itself." 1 *McCarthy on Trademarks* § 8:1. Regardless of the form of the trade dress claim, "the elements of the alleged trade dress must be clearly listed and described. Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement." *Id.* § 8:3 (footnote omitted).

Stouffer appears to be alleging at least the first two forms of trade dress infringement, and perhaps the third (if "shape and design of the product" can extend to things such as "on-screen persona" (¶ 137)). The Court will first address the packaging, and then address the intangible elements.

## 1.   Packaging

Stouffer claims that "[t]he National Geographic Defendants' [Accused] Series have misappropriated [Stouffer's] protectable trade dress . . . in the packaging of the [Accused] Series for sale and distribution." (¶ 139.) But Stouffer nowhere clearly lists or describes the elements of his packaging that he claims to be protectable trade dress. Moreover, although he claims "a similar mark and style for DVD packaging," his side-by-side comparison plainly shows otherwise:

---

[14] In his response brief, Stouffer says that National Geographic "attempts to mischaracterize" Claim 3 as a trade dress claim, as opposed to some broader (but undefined) species of unfair competition. (ECF No. 49 at 19.) The Court frankly cannot see how a reader of Claim 3 could interpret allegations about "protectable trade dress" as anything but a trade dress claim. Moreover, the remaining allegations in Claim 3 are either bare declarations of a likelihood of confusion or accusations related to damages and other remedies. (*See* ¶¶ 141–48.) Claim 3 is therefore unquestionably a trade dress claim.

 

(¶ 76.)

At another point in the complaint, Stouffer shows a different side-by-side comparison, using the Untamed Americas DVDs that National Geographic makes available as "Wild America" *outside* of the United States:

 



(¶¶ 66–68.)  Stouffer claims that National Geographic's packaging "is nearly indistinguishable" from his own.  (¶ 67.)  The Court need not address this assertion because these comparisons are irrelevant.  There is no allegation that National Geographic can be liable for its actions outside of the United States, so the alleged similarities cannot support Claim 3.  Indeed, inclusion of these particular side-by-side comparisons in the complaint seems intentionally designed to mislead.  Counsel for Stouffer are reminded that using filings for "any improper purpose" is sanctionable.  Fed. R. Civ. P. 11(b)(1).

Returning to Claim 3 proper, Stouffer has not adequately (much less plausibly) alleged trade dress infringement based on packaging, and the relevant side-by-side comparison—presumably one of the most salient examples he could provide—shows he cannot do so.  *Cf. O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist").  National Geographic's motion will therefore be granted with prejudice as to Claim 3's challenge to National Geographic's packaging.

2.    <u>Intangible Elements</u>

Stouffer alleges that the following make up at least some of the intangible trade dress he seeks to protect: "the image of two big-horn rams butting head[s]," "host Marty Stouffer's on-screen persona," and "the overall atmosphere of [the Wild America] programming."  (¶¶ 137, 139.)[15]  Regarding "on-screen persona," the Court understands Stouffer to be referring to the allegedly "uncanny similarity" between himself and Casey Anderson (¶ 78), illustrated by the following comparison:

 

(¶ 79.)  Stouffer may also be referring to him interacting with a grizzly bear he raised from a cub, as Casey Anderson allegedly also did.  (¶¶ 75, 77.)

Regarding "overall atmosphere," the Court understands Stouffer to be referring to elements such as "animal point of view camera shots, slow-motion action shots, anthropomorphized story-telling and presentation; [wide-angle nature] transition scenes between segments; and close-up shots of animals in their native habitats."  (¶¶ 82, 174.)

This is far from a clear and definite list, and so is deficient on those grounds.  In any event, Stouffer appears to be alleging that his entire style of documentary-making

---

[15] The Court recognizes that "intangible elements" could also include the packaging as part of the "total experience," so to speak, for those who come to know either Wild America or the Accused Series through the DVDs.  (*See* ¶ 139.)  Assuming "total experience" in this sense may be trade dress, the samples of Stouffer's and National Geographic's respective packaging styles provided in the complaint show a clear distinction, not similarity.

has become protectable trade dress.  He fails to plausibly allege as much for two reasons.

First, "the elements making up the alleged trade dress must have been used in such a manner as to denote product source.  Thus, a product feature whose only impact is decorative and aesthetic, with no source-identifying role, cannot be given exclusive rights under trade dress law."  1 *McCarthy on Trademarks* § 8:1 (footnote omitted). Here, Stouffer is claiming a set of aesthetic choices with no obvious source-identifying role.

Second, and closely related, the Lanham Act will not protect unregistered trade dress that is "functional."  *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007).  "The functionality doctrine . . . forbids the use of a product's feature as a trademark"—or trade dress—"where doing so will put a competitor at a significant disadvantage because the feature is essential to the use or purpose of the article or affects its cost or quality."  *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 169 (1995) (internal quotation marks omitted; certain alterations incorporated).  National Geographic points out, correctly, that Stouffer has the burden of proof as to nonfunctionality, yet he fails to plead anything in this regard.  (ECF No. 23 at 26–27.) *See also* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.").  Stouffer entirely ignores this argument in his response.  (*See* ECF No. 49 at 19–21.)  He is therefore deemed to concede that he cannot allege nonfunctionality.  Accordingly, National Geographic's motion will be granted with

prejudice as to Claim 3's challenge to the intangible elements of Wild America—and, consequently, all of Claim 3 will be dismissed with prejudice.

## C.     Copyright (Claim 6)

Finally, National Geographic argues that Stouffer's Claim 6, for copyright infringement, fails to state a claim.  (ECF No. 23 at 27–32.)

### 1.     Relevant Principles of Copyright Liability

The basic elements of a copyright claim are twofold: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  The second element is itself broken down into multiple inquiries, of which only one—"elements of the work that are original"—is relevant in light of the parties' arguments.

"Elements of the work that are original" means "legally protectable" elements. *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996).  Legally protectable elements are distilled through the "abstraction-filtration-comparison" test, also sometimes known as the "successive filtration" test.  *Id.* at 1284 & n.5.  "At the abstraction step, [courts] separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work."  *Id.* at 1284–85.  This stems from two established propositions.  First, "facts are not copyrightable."  *Feist*, 499 U.S. at 344.  Second, "[i]n no case does copyright protection . . . extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).  Thus, "[t]he copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).

Following the abstraction analysis, a court must "filter out the nonprotectable components of the product from the original expression." *Country Kids*, 77 F.3d at 1285.  Such filtering may involve the doctrine of "*scenes a faire*,"[16] which is a particular extension of the idea that matters in the public domain cannot be copyrighted. Under *scenes a faire*, courts "deny protection to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993).  "The *scenes a faire* doctrine also excludes from protection those elements of a [work] that have been dictated by external factors." *Id.*; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("Neither does copyright protection extend to copyright or 'stock' themes commonly linked to a particular genre.").

Once nonprotectable aspects of the work have been filtered, a court must "compare the remaining protected elements to the allegedly copied work to determine if the two works are substantially similar." *Country Kids*, 77 F.3d at 1285.  In particular, "the court must find that the defendant copied protectable elements of the plaintiff's [work] and that those protectable elements comprise a substantial part of the plaintiff's [work] when it is considered as a whole." *Gates Rubber*, 9 F.3d at 833.

2.    "Bighorn!" vs. "Mountains"

Stouffer's Claim 6 focuses on an Untamed Americas episode titled "Mountains" as compared to a Wild America episode titled "Bighorn!"  (¶¶ 170–76.)  "Specifically," Stouffer says,

---

[16] A Francophile would note that proper spelling of this phrase includes *accents grave*, *i.e.*, "*scènes à faire*."  Most case law regarding this concept drops the accent marks, and this Court will do the same.

the National Geographic Defendants have deliberately and intentionally copied the following elements:

a. [T]he introduction to the episode, where two rams head-butt one another as the introductory music crescendos;

b. Voice-over narration of the episode by an iconic individual.  The narration in both episodes begins immediately following the introductory credits.  In *Bighorn!*, Marty Stouffer narrates the episode.  In *Mountains*, actor Josh Brolin narrates the episode;

c. Segments focused on specific animals.  *Bighorn!* includes a segment about a mouse taking care of its young; *Mountains* includes a segment about [a] beaver taking care of its young.  Both *Bighorn!* and *Mountains* include a segment on bighorn sheep mating season;

d. Both episodes use the iconic nature slow-motion action shot popularized by Wild America, particularly during the segments on bighorn sheep.  During those segments, both episodes feature a slow motion shot of two bighorn sheep ramming one another.

(¶ 176.)[17]

National Geographic argues that these elements "are merely ideas, non-protectable tropes, and *scènes à faire* common in nature programs."  (ECF No. 23 at 29–30.)  In response, Stouffer does *not* argue to the contrary.  The Court therefore deems it conceded that the specified elements, at least in isolation, are not protectable expression under copyright law.

Stouffer instead argues that the protectability question "requires a more fact

---

[17] Stouffer further alleges that his "investigation remains ongoing" and he "reserves the right to amend this pleading upon further discovery of infringing conduct," although he "has already identified" three particular America the Wild episodes that bear a "striking similarity" to three particular Wild America episodes.  (¶ 178.)  Stouffer does not describe the striking similarities, and the overall structure of this allegation convinces the Court that he is not currently alleging copyright infringement of any National Geographic TV program other than "Mountains" as compared to "Bighorn!"

intensive analysis" and side-by-side viewing of the two episodes.  (ECF No. 49 at 23.)[18]

But Stouffer's allegations of similarity are perfectly clear even without watching the two

episodes.  And if Stouffer means to say that side-by-side viewing would reveal

additional (unpleaded) similarities, the argument is ineffective—one cannot defend

against a motion to dismiss with facts not alleged in the complaint.  *Smith v. Pizza Hut,*

*Inc.*, 694 F. Supp. 2d 1227, 1230 (D. Colo. 2010).

Stouffer alternatively argues that he has adequately pleaded infringement

because an original selection and arrangement of unprotected elements is protectable.

(ECF No. 49 at 23–25.)  *Cf. Feist*, 499 U.S. at 348 ("even a [telephone] directory that

contains absolutely no protectible written expression, only facts, meets the constitutional

minimum for copyright protection if it features an original selection or arrangement").  In

this regard, Stouffer points the Court to *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir.

2002).

The plaintiffs in *Metcalf* were screenwriters who developed a number of

treatments and screenplays "about a county hospital in inner-city Los Angeles and the

struggles of its predominantly black staff."  *Id.* at 1071.  Over a three-year span, they

gave these treatments and screenplays to friend and actor Michael Warren ("Hill Street

Blues"), who in turn relayed them to Steven Bochco (producer of "Hill Street Blues" and

many other programs).  *Id.* 1071–72.  Each time, they heard back from Warren that

---

[18] Stouffer specifically says that the Court must engage in an "actual viewing of [his] copyrighted *Wild America* content alongside the [Accused] Series."  (*Id.*)  But Claim 6 only raises a question of two episodes, "Bighorn!" versus "Mountains," not the entirety of Wild America versus the entirety of the four Accused Series.  Even if Claim 6 were pleaded as the latter, the Court is aware of no authority "endorsing this sort of 'corpus vs. corpus' theory of copyright infringement."  *Civility Experts Worldwide v. Molly Manners, LLC*, 167 F. Supp. 3d 1179, 1193 (D. Colo. 2016).

Bochco liked the idea but was too busy to pursue it.  *Id.*  Seven years later, however, a new Bochco-produced series, "City of Angels," premiered on network television, starring Warren.  *Id.* at 1072.  The setting was "a county-run, inner-city hospital in Los Angeles with a predominantly black staff."  *Id.*

The screenwriters sued Bochco, Warren, and others for copyright infringement, but the District Court granted the defendants' summary judgment motion, holding that the competing works "were not substantially similar."  *Id.*  The Ninth Circuit disagreed:

> The similarities between the relevant works are striking: Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs.  Both deal with issues of poverty, race relations and urban blight.  The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located.  Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city.  Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators.  Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest.  Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital.  In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1073–74.

The Ninth Circuit said that none of these elements, individually, would be protectable: "they are either too generic or constitute 'scenes a faire.'  One cannot copyright the idea of an idealistic young professional choosing between financial and emotional reward, or of love triangles among young professionals that eventually become strained, or of political forces interfering with private action."  *Id.* at 1074

(citation omitted).  "However, the presence of so many generic similarities and the common patterns in which they arise" was enough to raise a question of fact for trial, because "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element."  *Id.*

Stouffer's allegations fall well short of "a significant number of unprotectable elements" in a "particular sequence."  As to sequence, only two elements are described in terms of when they appear in the episode, namely, "two rams head-butt one another as the introductory music crescendos" and narration begins "immediately following the introductory credits."  (¶ 176(a), (b).)  As to number, Stouffer alleges barely a handful relevant comparisons—and, with the possible exception of an introductory head-butting-with-musical-crescendo sequence element, Stouffer's comparisons are qualitatively very weak even as compared to other unprotectable ideas.  They are nothing close to, for example, "the idea of an idealistic young professional choosing between financial and emotional reward."  *Metcalf*, 294 F.3d at 1074.  Rather, "[v]oice-over narration of the episode by an iconic individual," narration that begins "immediately following the introductory credits," "[s]egments focused on specific animals," segments about animals taking care of their young, and "slow-motion action shot[s]" (¶ 176(b)–(d)) are so standard as to essentially define the nature documentary genre.

Stouffer may believe these elements define the nature documentary genre *because* Wild America made them standard.  Even if true, they remain unprotectable "idea[s]" or "procedure[s]," 17 U.S.C. § 102(b), and Stouffer has not plausibly alleged that National Geographic's selection and arrangement amounts to copyright infringement.  *Cf. Civility Experts*, 167 F. Supp. 3d at 1190 ("demonstrating protectable

expression in nonfiction literature, and particularly instructional literature, is comparatively more difficult than demonstrating protectable expression in fiction").

For all these reasons, the Court will grant National Geographic's motion as to Stouffer's Claim 6.  Because the Court is not convinced that Stouffer could never allege sufficient similarities between "Mountains" and "Bighorn!" to plausibly plead a copyright claim, this dismissal is without prejudice.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. National Geographic's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint (ECF No. 23) is:

    a. DENIED WITHOUT PREJUDICE as to Stouffer's Claims 1, 2, 4, and 5;

    b. GRANTED WITH PREJUDICE as to Stouffer's Claim 3; and

    c. GRANTED WITHOUT PREJUDICE as to Stouffer's Claim 6;

2. Stouffer is GRANTED LEAVE to file an amended complaint consistent with this Order on or before **September 9, 2019**;

3. National Geographic shall answer or otherwise respond—to the amended complaint, or to the original complaint if Stouffer chooses not to amend—on or before **September 23, 2019**; and

4. The stay of discovery shall remain in place for the time being.  If National Geographic elects to file a second motion to dismiss, the stay of discovery will remain in place through the resolution of that motion.  If National Geographic elects to answer, the stay of discovery will be lifted and the parties shall proceed according to Magistrate Judge Gordon P. Gallagher's instructions at ECF No. 57.

Dated this 20th day of August, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge