## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 18-cv-3127-WJM-SKC

MARTY STOUFFER and
MARTY STOUFFER PRODUCTIONS, LTD,

      Plaintiffs,

v.

NATIONAL GEOGRAPHIC PARTNERS, LLC;
NGSP, INC.;
NGHT, LLC, d/b/a NATIONAL GEOGRAPHIC DIGITAL MEDIA;
NGC NETWORK US, LLC; and
NGC NETWORK INTERNATIONAL, LLC,

      Defendants.

---

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs Marty Stouffer and Marty Stouffer Productions, LTD (together, "Stouffer," unless the context requires otherwise), sue Defendants (collectively, "National Geographic") for trademark infringement, unfair competition, and deceptive trade practices. This case raises the question of what protections the First Amendment provides to those accused of trademark infringement. The Supreme Court and Tenth Circuit have never spoken definitively on this matter. In a previous round of Rule 12(b)(6) motion practice, the Court evaluated the "*Rogers* test," an approach pioneered by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and more or less followed by four other circuits. *See Stouffer v. Nat'l Geographic Partners, LLC*, 400 F. Supp. 3d 1161, 1171–77 (D. Colo. 2019) (ECF No. 64) ("*Stouffer*" or "Prior Order"). The Court concluded that the *Rogers* test, without more, did not strike the appropriate

balance between trademark rights and First Amendment rights. *Id.* at 1177–80.  The

Court instead proposed factors to weigh. *Id.* at 1179.  Because the parties could not

anticipate the Court's multi-factor test, the Court gave Stouffer an opportunity to

re-plead his claim, and National Geographic an opportunity to again move to dismiss.

*Id.* at 1180–81, 1189.

Stouffer filed an amended complaint (ECF No. 68) and National Geographic filed

a Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 72), which is

currently before the Court.  For the reasons explained below, the Court grants the

motion and dismisses this case with prejudice.

## I.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

claim in a complaint for "failure to state a claim upon which relief can be granted."  The

12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded

factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at

Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a

motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state

a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must

be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but

also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169,

1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*,

550 U.S. at 556).

## II.  BACKGROUND

Stouffer alleges substantially as follows.

### A.    The "Wild America" Series

Beginning in 1982 and continuing for the next fourteen years, the Public Broadcasting Service ("PBS") regularly televised the Wild America nature documentary series.  (¶¶ 27, 29.)[1]  During those fourteen years, Wild America "never fell out of the top ten most viewed television shows on PBS," and in some years it was "PBS's most-watched show."  (¶¶ 29–30.)

Wild America was produced by Plaintiff Marty Stouffer Productions, a company founded by Plaintiff Marty Stouffer and his brother, Mark, to produce nature documentaries.  (¶¶ 18, 25.)  "Throughout Wild America's fourteen year initial run on PBS, the Stouffer Brothers developed a unique filming style for the show, which utilized slow motion, close-ups, and time lapses to give viewers a more immersive experience than other nature and wildlife documentary programming."  (¶ 37.)  The series also became known for an image of two bighorn rams butting heads.  (¶ 86.)

When Wild America's run ended on PBS, the Stouffer Brothers continued to produce direct-to-video nature documentaries under the "Wild America" mark.  (¶ 32.)  They also produced a feature film titled "Wild America," which depicted their childhood and the origins of their passion for nature and filmmaking.  (¶¶ 44–45.)

All Wild America episodes remain available to purchase on DVD, or to stream through major video-streaming platforms such as those run by Amazon, Google, and

---

[1] All "¶" citations, without more, are to the amended complaint (ECF No. 68).

Apple.  (¶ 46.)  Through syndication, the original Wild America documentary series remains available to watch on television to this day.  (¶¶ 39, 41.)

Marty Stouffer Productions owns a trademark on "Wild America," which it federally registered in 1982.  (¶ 28.)

## B.      Stouffer's Discussions with National Geographic

National Geographic launched a television station, commonly known as Nat Geo TV, in 2001.  (¶ 52.)  National Geographic launched a sister channel, Nat Geo WILD, in 2010.  (¶ 54.)  Both channels feature nature-oriented documentary programming. (¶¶ 53, 55.)

In 2010 and 2011, Stouffer and National Geographic "engaged in numerous discussions regarding [National Geographic] potentially licensing or purchasing" Stouffer's Wild America film library.  (¶ 61.)  National Geographic "declined to purchase the Wild America Film Library, but asked [Stouffer] to keep [National Geographic] apprised of any updates regarding the sale of the film library."  (¶ 62.)

## C.      National Geographic's "Wild"-Themed TV Programs

On November 1, 2010, a Nat Geo TV executive e-mailed Stouffer, asking for permission to title an upcoming natural history miniseries "Wild Americas" or "Wildest Americas."  (¶¶ 63–64.)  Stouffer responded "that Wild America was trademarked and that both of [the] titles proposed . . . would be too close to the Wild America Mark." (¶ 66.)  National Geographic ended up airing the series in 2012 under the title "Untamed Americas" within the United States, and "Wild America" outside of the United States. (¶¶ 69–70.)  "[C]onsumers searching the internet for Wild America content can instead find the Untamed Americas series available for purchase on DVD and Blu-Ray under the 'Wild America' name" (¶ 72), but Stouffer does not allege that National Geographic

has any control over such sales.

Stouffer, unaware of the Untamed Americas series, continued discussions with National Geographic in 2012 about licensing or selling the Wild America film library. (¶ 75.)  These discussions included "using Wild America footage to create content for a new, then-unnamed Nat Geo TV series starring television personality Casey Anderson." (¶ 76.)  These discussions did not bear fruit.  (¶ 77.)

In 2013, National Geographic released a television series titled "America the Wild."  (¶ 78.)  Stouffer says that America the Wild "replicat[es] the most minute details of Wild America in its production" (¶ 79), as illustrated by:

- "virtually indistinguishable" titles (¶ 74);

- "several episodes" of both series in which the host interacts with a grizzly bear that he raised from a cub (in the following still shots, Marty Stouffer/Wild America is on the left and Casey Anderson/America the Wild is on the right):

 

 

(¶¶ 81, 83);

- the hosts interacting with rams, supposedly "invoking the imagery from Wild America's introductory scene, in which two rams butt heads dramatically":

 

(¶ 83);[2]

- "copy[ing]" of "many iconic images from Wild America, including, among others, the image of two big horn sheep head-butting one another" (¶ 86), although Stouffer provides no side-by-side comparisons of such copying;

- a similar "structure" in "many" episodes, namely, "introducing an animal, following said animal, recording footage of the animal in conflict, and providing information about the animal" (¶ 87);

- the hosts "pos[ing] for a photo shoot" in the middle of an episode in a similar way:

 

---

[2] The ram with which Casey Anderson butts heads is stuffed.  (*Id.*)

(¶ 83);

- "an uncanny similarity between each show's host," with Casey Anderson adopting an "appearance and persona [that] closely resemble[s] the distinctive look and style of Marty Stouffer":

 

(¶¶ 84–85); and

- "a similar mark and style for DVD packaging":

 

(¶ 82).

In 2014, National Geographic premiered "Surviving Wild America," another nature-focused series.  (¶ 90.)  It features "two Australian hosts exploring the Okefenokee Swamp, located in the Southeastern region of the United States."  (¶ 91.)

In 2018, National Geographic premiered another nature documentary series, this

one titled "America's Wild Frontier."  (¶ 92.)

The Court will refer to the four National Geographic TV series at issue here—Untamed Americas, America the Wild, Surviving Wild America, and America's Wild Frontier—as the "Accused Series."  (*See* ¶ 93.)  The Accused Series are available to purchase or stream through at least Amazon, Google, and Apple.  (¶ 103.)

**D.     Stouffer's Claims**

Based on the foregoing, Stouffer brings four causes of action:

- federal trademark infringement (15 U.S.C. § 1114(1));

- federal trademark dilution (15 U.S.C. § 1125(c));

- unfair competition under Colorado common law; and

- violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.*

### III.  ANALYSIS

Similar to the previous motion practice, National Geographic argues that Stouffer's claims are all fundamentally trademark-based and all must be dismissed to protect National Geographic's First Amendment interests.  *See Stouffer*, 400 F. Supp. 3d at 1169–70.  (*See also* ECF No. 72.)  Stouffer argues that he has pleaded enough to overcome a First Amendment challenge, at least at this stage, but does not argue that any of his four claims is *not* subject to a First Amendment defense.  (*See* ECF No. 76.) Accordingly, the Court finds that the only matter currently at issue is whether First Amendment interests require the Court to dismiss Stouffer's complaint at this pleading phase.

**A.      The *Rogers* Test and the Court's "Genuine Artistic Motive" Test**

As the Court set forth in the Prior Order, trademark claims are normally evaluated

according to a multi-factor likelihood of confusion test.  *Stouffer*, 400 F. Supp. 3d at

1170.  However, in *Rogers*, the Second Circuit held that the First Amendment requires

some tolerance even for likelihood of confusion when it comes to titles of expressive

works.  *Rogers*, 875 F.2d at 998–1001.  The two-part test arising from that decision, *i.e.*,

the *Rogers* test, inquires as follows:

> **First**, does the title have "some artistic relevance" (later
> described as "the appropriately low threshold of minimal
> artistic relevance") to "the underlying work"?  If not, the
> traditional likelihood-of-confusion factors apply.  But if so,
> then **second**, does "the title explicitly mislead[] as to the
> source or the content of the work"?  If the answer to this
> second question is "yes," the traditional likelihood-of-
> confusion factors apply.  If the answer is "no," then "the
> danger of restricting artistic expression" outweighs the
> likelihood-of-confusion factors as a matter of law.

*Stouffer*, 400 F. Supp. 3d at 1171–72 (quoting *Rogers*, 875 F.2d at 999–1000 & n.6)

(boldface and alterations in original).

The Tenth Circuit has neither approved nor disapproved of the *Rogers* test,

leaving this Court free to decide whether to adopt that test.  *Id.* at 1172–73.  The Court

therefore asked itself three questions:

"First, does the Lanham Act need a limiting construction to protect First

Amendment interests?"  *Id.* at 1177.  The Court answered "yes."

"Second, must the First Amendment-based limiting construction on the Lanham

Act lead to a test that a court may apply before trial, as opposed to first adjudicating the

case under the traditional likelihood-of-confusion factors and only reaching the First

Amendment question if such confusion is found?"  *Id.* at 1178.  The Court concluded

that "the answer is 'yes, ideally,' with the 'ideally' qualification reflecting the need to balance the parties' interests." *Id.* The Court analogized the matter to qualified immunity in civil rights lawsuits, which should be resolved as early as possible in the litigation. *Id.* at 1178 n.10.

"Third, is the *Rogers* test the right test?" *Id.* With "the luxury of thirty years of court decisions applying *Rogers*, demonstrating its strengths and weaknesses," the Court was "convince[d] . . . that *Rogers* should not be adopted as-is." *Id.* The Court was primarily motivated by a decision from the Sixth Circuit (*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003)) and a decision from the Ninth Circuit (*Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018)). Both decisions are examples of courts struggling to assimilate unanticipated factual patterns into the *Rogers* test—factual patterns that raise legitimate concerns about whether *Rogers* tilts too far in favor of the junior user's First Amendment interests. *See Stouffer*, 400 F. Supp. 3d at 1173–74, 1176–77, 1178–79. The Court therefore proposed six non-exclusive factors to weigh, rather than the two questions posed by *Rogers*:

- Do the senior and junior users use the mark to identify the same kind, or a similar kind, of goods or services? . . .

- To what extent has the junior user "added his or her own expressive content to the work beyond the mark itself[]"[?]

- Does the timing of the junior user's use in any way suggest a motive to capitalize on popularity of the senior user's mark?

- In what way is the mark artistically related to the underlying work, service, or product?

- Has the junior user made any statement to the public, or engaged in any conduct known to the public, that

suggests a non-artistic motive?  This would include
"explicitly misleading" statements, . . . but is not confined
to that definition.

- Has the junior user made any statement *in private*, or
engaged in any conduct *in private*, that suggests a non-
artistic motive?

*Id*. at 1179 (citations omitted; emphasis in original).  The point of these factors is to

assist in answering the question, "Did the junior user have a genuine artistic motive for

using the senior user's mark or other Lanham Act-protected property right?"  *Id*.

However,

[a]lthough the foregoing test is framed in terms of the junior
user's state of mind, the Court further [held] that, to
adequately protect First Amendment interests, the objective
facts may sometimes excuse further inquiry into the junior
user's subjective motives. . . .  The First Amendment places
the thumb on the scale of expressive use, even if at the
expense of sometimes allowing junior users with subjectively
"unartistic" motives to avoid Lanham Act liability.

*Id*. at 1180.

## B.    Criticism of the Genuine Artistic Motive Test

National Geographic "respectfully asserts that allowing an examination into

motive and intent in the context of protected speech would lead to the unwarranted

chilling of free expression by making it more difficult—with important First Amendment

concerns at stake—to dismiss cases before discovery."  (ECF No. 72 at 6 n.4.)[3]  The

Court also permitted a group of intellectual property law professors ("amici") to file an

amicus brief raising similar concerns.  (ECF No. 74.)  National Geographic and amici

both assert that *Rogers*, as interpreted by the Ninth Circuit in *Twentieth Century Fox TV*

_____

[3] All ECF page citations are to the page number in the CM/ECF header, which does not
always match the document's internal pagination, particularly in briefs with unnumbered caption
pages.

*v. Empire Distribution, Inc.*, 875 F.3d 1192, 1195 (9th Cir. 2017), discussed below, should be the governing test.  (ECF No. 72 at 6–7 n.4; ECF No. 74 at 18.)  The Court declines to fall back to the *Rogers* test (much less National Geographic's preferred version of it) for the following reasons.

First, *Rogers* itself is not specifically designed "to dismiss cases before discovery."  (ECF No. 72 at 6 n.4.)  Even after a circuit has adopted *Rogers*, cases applying it still sometimes go through discovery and to summary judgment before the *Rogers* question is resolved.  Indeed, the three *Rogers*-applying cases the Court has cited thus far each arose on an appeal from summary judgment.  *See Gordon*, 909 F.3d at 260; *Twentieth Century Fox*, 875 F.3d at 1195; *Parks*, 329 F.3d at 442.  Again, as with the analogy to qualified immunity, the Court agrees it is important to resolve the First Amendment question sooner rather than later, and in some cases the pleading phase will be the appropriate "sooner" as compared to the summary judgment phase's "later."  But a test *specifically designed* to be applied at the pleading phase is not "consistent with both parties' interests."  *Stouffer*, 400 F. Supp. 3d at 1178.

Second, the Ninth Circuit's *Twentieth Century Fox* decision, in light of the same circuit's *Gordon* decision a year later, illustrates precisely why *Rogers* plus *Twentieth Century Fox* creates problems.  *Twentieth Century Fox* confirmed that, in the Ninth Circuit, *Rogers*'s "explicitly misleading" prong means what it says: the junior user must make "overt claims or explicit references" to association with the senior user.  875 F.3d at 1199; *see also Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) ("We must ask . . . whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion." (internal quotation marks

omitted)).  Moreover, "the use of a mark alone is not enough to satisfy this prong of the

*Rogers* test."  *Twentieth Century Fox*, 875 F.3d at 1199 (internal quotation marks

omitted).  But in *Twentieth Century Fox*, as with all decisions this Court has reviewed

applying *Rogers* (before *Gordon*), the junior user was using the mark in association with

a product meaningfully and noticeably different from the product the senior user

marked under the disputed mark.[4]  In *Gordon*, by contrast, the owner of the "Honey

Badger don't care" trademark—which was registered as a trademark for greeting cards,

among other products—faced off against a greeting card maker that, without

permission, published cards with slight variations on the Honey Badger mark, such as

"Honey Badger and me just don't care."  909 F.3d at 262.  And not only was the

defendant producing the same type of product as the plaintiff (greeting cards), the

defendant was using the Honey Badger mark precisely as the plaintiff did: "to convey a

humorous message through . . . the honey badger's aggressive assertion of apathy."

*Id.* at 268–69.

  *Gordon* recognized that the *Rogers* test, taken at face value, essentially

---

[4] *See Twentieth Century Fox*, 875 F.3d at 1195 (Empire Distribution recording studio versus "Empire" television series); *Brown*, 724 F.3d at 1245 (Jim Brown versus video game that used his likeness); *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) ("Play Pen" strip club in East Los Angeles versus video game depicting "Pig Pen" strip club in "East Los Santos," a fictional game area designed to resemble East L.A.); *Parks*, 329 F.3d at 442–43 (Rosa Parks versus the song "Rosa Parks," by Outkast); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664–65 (5th Cir. 2000) ("Polo" clothing versus a wealthy lifestyle magazine named "Polo"); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) (Tiger Woods versus a painter who made a painting depicting various scenes from Woods's record-setting 1997 win at The Masters); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901–02 (9th Cir. 2002) (Barbie versus the song "Barbie Girl," by Aqua); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) (famous college football team's uniforms versus a painter who painted that football team in various settings); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 492 (2d Cir. 1989) ("Cliffs Notes" study guides versus "Spy Notes," a parody that used a yellow and black layout on its cover); *Rogers*, 875 F.2d at 996 (Ginger Rogers versus Federico Fellini's film, *Ginger and Fred*).

destroyed the value of the Honey Badger mark—and perhaps many other marks, if parties are willing to be sued and defend themselves under the *Rogers* test.  *Id.* at 268– 71.  As shown in that case, "Honey Badger and me just don't care" is minimally artistically relevant to the content of the greeting card (thus satisfying step one of *Rogers*) and is not explicitly misleading (step two of *Rogers*), at least under *Twentieth Century Fox*'s interpretation of "explicitly misleading."  Thus, it seems that anyone can use a trademark, *even to sell the same good or service for which the trademark was granted*, if the good or service can be deemed "art."  To avoid taking the drastic step of destroying the value of trademarks in the name of the First Amendment, *Gordon* reinterpreted Ninth Circuit precedent such that use of a mark alone *can* be explicitly misleading "if consumers would ordinarily identify the source by the mark itself," among other considerations.  *Id.* at 270–71.

As this Court previously stated, "*Gordon* is analytically messy" because it "was constrained by precedent while trying to prevent what it suspected to be an abuse of *Rogers*.  *Gordon* therefore makes its point through an awkward attempt to avoid looking like it is overruling what it does not have the power to overrule [*i.e.*, previous Ninth Circuit precedent]."  *Stouffer*, 400 F. Supp. 3d at 1178.  But *Gordon* nonetheless demonstrates that the *Rogers* test, as it had been interpreted up to that point, opens the door to free use of trademarks for "artistic" goods and services, even on precisely the same goods and services for which the trademark was granted.  This Court, unconstrained by *Rogers* or any other circuit's interpretive precedent, has concluded that considerations beyond those enumerated in *Rogers* are necessary to avoid the problem illustrated by *Gordon*.

Because the First Amendment says nothing specifically about its effect on trademarks, any First Amendment-based limiting construction on the Lanham Act (*Rogers* or otherwise) is necessarily judge-made law—in other words, a species of federal common law.  A major premise of the common-law tradition is that judges will adapt their tests and rules as unexpected situations arise.  National Geographic and amici, by contrast, appear to believe that *Rogers* plus *Twentieth Century Fox* is already the perfect test.  But they nowhere grapple with the consequences, namely, that *Rogers* plus *Twentieth Century Fox* means that trademarks registered for arguably artistic products and services are not worth the paper that the trademark registration is printed upon.  As long as a junior user makes no overt claim to association with the senior user, the junior user can market precisely the same artistic product or service under precisely the same mark.  But *why* should this be permitted, even in the name of the First Amendment?  *Cf.* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10:17.10 (5th ed., Mar. 2020 update) ("Application of the *Rogers* balancing test is just that: a balancing of competing interests.  It does not mean that a junior user producer of an expressive work can ignore a senior user and create probable confusion just because the title has some 'artistic relevance' to the accused expressive work and the junior user does not falsely assert that there is an affiliation.").

In short, the matter ultimately comes down to how much solicitude one believes First Amendment interests should receive in this context.  This Court believes "[t]he First Amendment places the thumb on the scale of expressive use." *Stouffer*, 400 F. Supp. 3d at 1180.  National Geographic and amici believe the First Amendment places a fist on the scale.  The Court stands by its view that the *Rogers* test (as interpreted by

*Twentieth Century Fox* or otherwise) is needlessly rigid and fails to account for the realities of each situation.

Finally, the Court notes National Geographic's argument that this Court's multi-factor test "would put producers of national programming in the challenging position of complying with inconsistent standards across the country in the important area of title protection and free speech rights." (ECF No. 72 at 6–7 n.4.) The implication is that *Rogers* is the national standard, which is incorrect. The Second, Fifth, Sixth, Ninth, and Eleventh Circuits have explicitly adopted the *Rogers* test, but even they do not always apply *Rogers* in the same way. *See Stouffer*, 400 F. Supp. 3d at 1171–77.

Regardless, while the Court hopes its rulings in this case have meaningfully added to the federal common law on this issue, and will influence other judges' consideration of the same matters, the decisions of federal district judges, reported or otherwise, set no precedent except as between the parties before the Court. *See Amica Life Ins. Co. v. Wertz*, 350 F. Supp. 3d 978, 981 (D. Colo. 2018) ("the undersigned['s] decisions . . . bind no one but the parties before him"); *Hernandez v. Ray Domenico Farms, Inc.*, 250 F.Supp.3d 789, 801 (D. Colo. 2017) ("[a]lthough the judges of this District strive to respect each other's decisions, we do not bind each other"). Accordingly, any worries about national inconsistency must be raised with the Court of Appeals, if at all.

## C.    Application of Genuine Artistic Motive Test

The Court now turns to an evaluation of the amended complaint in light of the six questions set forth in the Prior Order. Although the Prior Order stated that the six questions are "[a]mong the relevant questions a court may ask," *Stouffer*, 400 F. Supp. 3d at 1179, and therefore not exclusive, the parties confine themselves to these

questions.  The Court will do the same.

1. Do the senior and junior users use the mark to identify the same kind, or a similar kind, of goods or services?

The answer to this question is yes.  Stouffer uses the Wild America Mark, and National Geographic uses its titles, to identify nature documentary television programming.

2. To what extent has the junior user added his or her own expressive content to the work beyond the mark itself?

Here, Stouffer "acknowledges that the [Accused] Series had some degree of original expressive content added by [National Geographic] given that [National Geographic] was creating new programming, [but] such original content is fundamentally undermined by [National Geographic]'s wholesale use of the *Wild America* template to do so."  (ECF No. 76 at 22.)  By "*Wild America* template," Stouffer refers to the "structure" of "many" Accused Series episodes, namely, "introducing an animal, following said animal, recording footage of the animal in conflict, and providing information about the animal" (¶ 87); and the "uncanny similarity between each show's host," with Casey Anderson adopting an "appearance and persona [that] closely resemble[s] the distinctive look and style of Marty Stouffer" (¶¶ 84–85).  (*See also* ECF No. 76 at 22 ("[National Geographic] not only copied *Wild America*'s title, but also its entire concept and episode structure, including such minute details such as the physical characteristics of the hosts.").)

To be clear, Marty Stouffer and Casey Anderson look hardly at all alike (*see* Part II.C, above), so this contention is rejected out of hand.  *Cf. Scott v. Harris*, 550 U.S. 372, 379–80 (2007) (when given relevant objective evidence like video, the Court can usually decide the state of facts as a matter of law).  As for episode structure, the Court notes

its previous ruling that these sorts of structural decisions "are so standard as to essentially define the nature documentary genre." *Stouffer*, 400 F. Supp. 3d at 1189. However, that ruling was in the context of a copyright analysis. *See id.* The Court does not rule out the possibility that adopting a title the same as, or similar to, a trademark (*e.g.*, National Geographic's America the Wild versus Stouffer's Wild America) *plus* using that title to present the same type of good or service associated with the trademark (the factor considered in the previous subsection) *plus* presenting the artistic expression in an obviously similar way as the trademarked good or service can be evidence of a non-artistic intent with respect to the use of the trademark.

Thus, at this pleading phase, Stouffer's allegations deserve some weight. Even so, Stouffer's allegations in this regard are—for the second time—rather generic. Except for nature documentaries that are not about animals at all, it is simply hard to imagine a nature documentary that does not "introduc[e] an animal, follow[] said animal, [show] the animal in conflict, and provid[e] information about the animal." (¶ 87.) Stouffer's repeated failure to plead anything more specific must factor into the Court's overall analysis, below.

3.  Does the timing of the junior user's use in any way suggest a motive to capitalize on popularity of the senior user's mark?

The Wild America series on PBS ended in 1996. (¶¶ 28–29.) The most recent Stouffer-produced, Wild America-branded program was one or more direct-to-video "Wild America Specials which were successfully advertised, marketed, and sold . . . in the 1990s and 2000s." (¶ 32.) Stouffer does not say how far into the 2000s this advertising and marketing extended. However, Wild America episodes remains in syndication (¶¶ 39, 41) and can be bought on DVD, or for streaming or download (¶ 46).

Stouffer offers no statistics on viewership in syndication, or sales of DVDs, streams, or downloads, during the relevant time period, which is 2012 (when National Geographic's "Untamed Americas" premiered) through the present.

4.    In what way is the mark artistically related to the underlying work, service, or product?

Stouffer uses the Wild America mark, and National Geographic uses the Accused Series' titles, for the same purpose: to inform the viewer about what she should expect to see in the program.  (¶¶ 24, 80–83, 90–92.)

5.    Has the junior user made any statement to the public, or engaged in any conduct known to the public, that suggests a non-artistic motive?

The Court agrees with Stouffer that the use of "Wild America" as the name for the international version of the Untamed Americas series is relevant to this consideration, even if not actionable of itself.  (ECF No. 76 at 19.)  In other words, it could suggest a desire to use Stouffer's mark for its trademark value.

6.    Has the junior user made any statement in private, or engaged in any conduct in private, that suggests a non-artistic motive?

National Geographic contacted Stouffer to ask for permission to title its upcoming series (what became "Untamed Americas") as either "Wild Americas" or "Wildest Americas."  (¶¶ 63–64.)  This could suggest a desire to use the mark (or something close to it) for its trademark value.  On the other hand, it could suggest a mere desire to avoid unnecessary conflict.

7.    Synthesis

As the Court stated in the Prior Order, "the objective facts may sometimes excuse further inquiry into the junior user's subjective motives."  *Stouffer*, 400 F. Supp. 3d at 1180.  Although there is evidence (particularly National Geographic's use of "Wild

America" outside of the United States) that points toward a subjectively un-artistic motive, the Court finds that this is the type of case where further inquiry into the junior user's subjective motives is nonetheless excused.

First, the fact that National Geographic is using its titles to describe the content of the Accused Series (*see* Part III.C.4, above) weighs heavily in National Geographic's favor.  The choice of a title for one's expressive creation is an expressive choice unto itself, including the choice of a descriptive title.  Each of the Accused Series substantially focuses on America's wildlands.  While the English language is notably quite expansive, the range of words to describe such programming is limited.  Yet Stouffer would not allow even a *synonym* for "wild" (*i.e.*, "Untamed Americas").  If trademarked words themselves *and* their synonyms are off-limits, then the artistic choice regarding a title becomes significantly constricted.[5]

The case might be different if Stouffer's Wild America series had been about, say, American teens engaging in risky behavior, and National Geographic's America the Wild covered the same or a similar topic.  Given the looser relation between the title and the subject matter, the inference would be stronger that National Geographic chose its title primarily in hopes of benefiting from the goodwill created by Stouffer's trademark as it relates to programming about risky teenage behavior, and only secondarily (if at all) for artistic reasons.  Here, however, National Geographic selected titles that correspond

---

[5] Notably, the closest the Tenth Circuit has ever come to endorsing the *Rogers* test is in the context of emphasizing (in a case about Oklahoma's statutory right of publicity) that a test known as the "no adequate alternative avenues" test was not robust enough to "sufficiently accommodate the public's interest in free expression." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 971 (10th Cir. 1996) (citing *Rogers* in support of this statement, but not discussing the case).  In other words, the fact that there may be "adequate alternatives" to the Accused Series' titles (*e.g.*, "Undomesticated Animals in the United States") does not dispel the First Amendment concerns.

closely to nature documentary programming.  Thus, the objective inference is strong

that its motive was genuinely artistic.  *Cf. Rogers*, 875 F.2d at 1001 ("these names

[Ginger and Fred] are not arbitrarily chosen just to exploit the publicity value of their real

life counterparts but instead have genuine relevance to the film's story").

Second, the amended complaint offers nothing suggesting that National

Geographic was attempting to ride Stouffer's wave (*see* Part III.C.3, above).  *Cf.*

*Gordon*, 909 F.3d at 216–62 (unlicensed Honey Badger greeting card maker began

selling its cards when Honey Badger brand awareness was very high).  To the contrary,

the amended complaint contains a notable contrast between providing significant detail

about Wild America's success in the 1980s and '90s (¶¶ 27–31, 43–44 (allegations

about ratings, viewership, and brand awareness)) and providing no such detail about

interest in Wild America since.  Indeed, rather than allegations about continuing *interest*

in Wild America since the mid-1990s, Stouffer provides allegations about Wild

America's continuing *availability*.  (¶¶ 33, 39, 41, 46.)  *Cf. O'Brien v. DiGrazia*, 544 F.2d

543, 546 n.3 (1st Cir. 1976) ("when a complaint omits facts that, if they existed, would

clearly dominate the case, it seems fair to assume that those facts do not exist").

Finally, the amended complaint provides only the most generic of accusations

that the Accused Series should not be deemed National Geographic's original

expressive content (*see* Part III.C.2, above).  Notably, Stouffer's original complaint

asserted a copyright claim on essentially the same basis and the Court dismissed it

without prejudice, but Stouffer chose not to re-plead it in the amended complaint.  *See*

*Stouffer*, 400 F. Supp. 3d at 1186–89.

For all these reasons, the Court finds that, even viewing Stouffer's allegations in

the light most favorable to him, the objective facts establish that National Geographic's

titles for the Accused Series deserve First Amendment protection, even if Stouffer could

prove likelihood of confusion.  *Id.* at 1180.  Therefore, Stouffer's claims must be

dismissed.  Moreover, Stouffer's amended complaint is barely different from his original

complaint, convincing the Court that further opportunity to amend would be futile.

Accordingly, the Court will dismiss with prejudice.  *See Foman v. Davis*, 371 U.S. 178,

182 (1962).[6]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint (ECF
       No. 72) is GRANTED;

2.     Plaintiffs' amended complaint (ECF No. 68) is DISMISSED with prejudice;

3.     The Clerk shall enter judgment in favor of Defendants and against Plaintiffs and
       shall terminate this case; and

4.     Defendants shall have their costs, if any, upon compliance with D.C.COLO.LCivR
       54.1.


Dated this 8th day of May, 2020.

BY THE COURT:

William J. Martínez
United States District Judge

---

[6] Given this disposition, the Court need not reach National Geographic's alternative argument that the doctrine of laches bars part of Stouffer's claims.  (*See* ECF No. 72 at 23–25.)